## MEYER *v.* STATE OF NEBRASKA.

ERROR TO THE SUPREME COURT OF THE STATE OF NEBRASKA.

No. 325. Argued February 23, 1923.—Decided June 4, 1923.

A state law forbidding, under penalty, the teaching in any private, denominational, parochial or public school, of any modern language, other than English, to any child who has not attained and success-

fully passed the eighth grade, invades the liberty guaranteed by the Fourteenth Amendment and exceeds the power of the State. P. 399.

So *held* where the statute was applied in punishment of an instructor who taught reading in German, to a child of ten years, in a parochial school.

107 Neb. 657, reversed.

ERROR to a judgment of the Supreme Court of Nebraska affirming a conviction for infraction of a statute against teaching of foreign languages to young children in schools.

*Mr. Charles E. Sandall,* with whom *Mr. I. L. Albert, Mr. Arthur G. Wray* and *Mr. August Wagner* were on the briefs, for plaintiff in error.

The right to choose and pursue a given legitimate vocation is within the rights guaranteed by the Fourteenth Amendment.

The vocation of the plaintiff is teaching—a legitimate vocation—and in teaching, as he did, a certain subject in a language other than English, he encroached upon the rights of no other person. *Ritchie* v. *People,* 155 Ill. 98; *Ex parte Harrison,* 212 Mo. 88; *Butchers' Union Co.* v. *Crescent City Co.,* 111 U. S. 746; *Hooper* v. *California,* 155 U. S. 662; *Allgeyer* v. *Louisiana,* 165 U. S. 589; *Cully* v. *Baltimore & Ohio R. R. Co.,* 1 Hughes, 539; *Adair* v. *United States,* 208 U. S. 578; *Munn* v. *Illinois,* 94 U. S. 113; *Taylor* v. *Beckham,* 178 U. S. 548; *Powell* v. *Pennsylvania,* 127 U. S. 678. *Berea College* v. *Kentucky,* 211 U. S. 45, dissenting opinion, p. 67.

Imparting knowledge in a foreign language is not inherently immoral or inimical to the public welfare, and not a legitimate subject for prohibitory legislation. In fact, an examination of the statute will show that the legislature did not regard the teaching of a pupil in some language other than English as vicious or inimical to the public welfare. It applies only to schools, leaving teach-

ers and others at liberty to teach privately. *State* v. *Redmon,* 134 Wis. 89; *People* v. *Weiner,* 271 Ill. 74.

When the legislature by clear implication finds that the practice or pursuit against which the act is leveled does not of itself injuriously affect the public, a measure designed to prohibit it is unconstitutional. It being clear, therefore, both upon reason and legislative finding, that the prohibited acts are not harmful, this measure, insofar as it imposes upon teachers, both lay and clerical, penalties of fine and imprisonment for the giving of instruction in languages, is violative of their constitutional right to engage in the practice of their chosen profession or calling. *Coal Co.* v. *People,* 17 Ill. 66; *Adams* v. *Tanner,* 244 U. S. 590.

The statute, as construed by the Supreme Court of Nebraska, is prohibitive, not regulatory of a legitimate vocation.

The statute in question is not a legitimate exercise of the police power. The exercise of the police power can be justified only when it adds, in a substantial way, to the security of the fundamental rights.

The relation to the common good of a law fixing a minimum of education is readily perceived, but how one fixing a maximum—limiting the field of human knowledge—can serve the public welfare or add substantially to the security of life, liberty or the pursuit of happiness is inconceivable. *State* v. *Redmon, supra; Mugler* v. *Kansas,* 123 U. S. 623; *Wyeth* v. *Cambridge Board of Health,* 200 Mass. 474; *State* v. *Sperry,* 94 Neb. 785.

One claim put forward is, that the statute forwards the work of Americanization. But in our desire for the Americanization of our foreign born population we should not overlook the fact that the spirit of America is liberty and toleration—the disposition to allow each person to live his own life in his own way, unhampered by unreasonable and arbitrary restrictions.

The law, as construed by the Supreme Court of Nebraska, operates to deny the plaintiff in error the equal protection of the law.

The law is directed against the teaching in or of a foreign language in public, private, denominational and parochial schools. It leaves those engaged in giving private lessons in such languages free to pursue their vocations. *Nebraska District Evangelical Synod* v. *McKelvie,* 104 Neb. 93; *Bailey* v. *People,* 190 Ill. 28; *Dunahoo* v. *Huber,* 185 Ia. 753; *State* v. *Sloane,* 49 N. J. L. 356; *State* v. *Ramsey,* 48 Minn. 236; *Lincoln* v. *Lincoln Gas Co.,* 182 Fed. 926; *Haynes* v. *Lapeer Circuit Judge,* 201 Mich. 138; *Smith* v. *Board of Examiners,* 85 N. J. L. 46.

*Mr. Mason Wheeler* and *Mr. O. S. Spillman,* with whom *Mr. Clarence A. Davis,* Attorney General of the State of Nebraska, and *Mr. Hugh La Master* were on the brief, for defendant in error.

The federal constitutional question was injected into the case as an afterthought and too late to permit its review by this Court.

The statute was a legitimate exercise of the police power of the State.

The statute forbids the teaching of foreign languages to children of tender years before such children are grounded in the English tongue. It does not forbid the use of foreign languages by persons of maturity or prevent the study of foreign languages by persons who have passed the eighth grade. It does not in any way interfere with *bona fide* religious instruction or with any legitimate religion.

The object of the legislation, as is pointed out in *Nebraska District of Evangelical Synod* v. *McKelvie,* 104 Neb. 93, and in the second case, 187 N. W. 927, and in the decision below, and by the Ohio Supreme Court in *Pohl* v. *State,* 102 Oh. St. 474, and by the Iowa Supreme Court in *Bartels* v. *State,* 191 Ia. 1060, was to create an enlight-

ened American citizenship in sympathy with the princi-
ples and ideals of this country, and to prevent children
reared in America from being trained and educated in
foreign languages and foreign ideals before they have had
an opportunity to learn the English language and observe
American ideals. It is a well known fact that the lan-
guage first learned by a child remains his mother tongue
and the language of his heart. The purpose of the statute
is to insure that the English language shall be the mother
tongue and the language of the heart of the children
reared in this country who will eventually become the
citizens of this country.

These foreign language statutes are no more difficult
to sustain under the police power of the State than the
Bank Guarantee Act, the Workmen's Compensation Acts,
the Female Labor Laws, and Tenement Housing legisla-
tion.

Taking the test laid down as to the legitimate exercise
of the police power by Freund (§ 143): A danger exists;
of sufficient magnitude; concerning the public; the pro-
posed measure tends to remove it; the restraint is a re-
quirement in proportion to the danger; it is possible to
secure the object sought without impairing essential rights
and principles. *Wilson* v. *New,* 243 U. S. 332; *Muller* v.
*Oregon,* 208 U. S. 412; *Second Employers' Liability Cases,*
223 U. S. 1; *Arizona Employers' Liability Cases,* 250 U. S.
400; *Block* v. *Hirsh,* 256 U. S. 135. If it is within the
police power of the State to regulate wages, to legislate
respecting housing conditions in crowded cities, to pro-
hibit dark rooms in tenement houses, to compel landlords
to place windows in their tenements which will enable
their tenants to enjoy the sunshine, it is within the police
power of the State to compel every resident of Nebraska
so to educate his children that the sunshine of American
ideals will permeate the life of the future citizens of this
Republic.

The recognized general necessity for legislation similar to the Nebraska foreign language act is shown by the fact that twenty-one States besides Nebraska have enacted similar foreign language laws.

In no State has this foreign language legislation been successfully attacked. Three attempts only have been made, in Ohio, Iowa and Nebraska. In every adjudicated case the legislation has been upheld and sustained as against all constitutional objections.

The police power itself is an attribute of sovereignty. It exists without any reservation in the Constitution. It is founded on the right of the State to protect its citizens, to provide for their welfare and progress and to insure the good of society. It corresponds to the right of self preservation in the individual. Its application varies with the exigencies of the situation and with the progress of mankind. It is the foundation of our social system and upon it depends the security of social order, the life and health of the citizen, the comfort of existence in a thickly populated community, the enjoyment of private and social life, and the beneficial use of property. It extends to the protection of life, health, comfort and welfare of persons, protection of property, and to the welfare of the State itself. All natural persons within the jurisdiction hold their property and pursue their various callings subject to the police power. It is inherent in the various States of the Union, as well as in the Federal Government. To the extent that property or business is devoted to public use or is affected with a public interest it is subject to regulation by the police power. It extends to regulation of education as the very existence of our government, as well as its progress and development, depends upon the intelligence of our citizenry. *McLean* v. *Arkansas,* 211 U. S. 539; *Muller* v. *Oregon,* 208 U. S. 412; *Holden* v. *Hardy,* 169 U. S. 366; *Jacobson* v. *Massachusetts,* 197 U. S. 11; *Atkin* v. *Kansas,* 191 U. S. 207; *Murphy* v. *California,*

225 U. S. 623; *Booth* v. *Illinois,* 184 U. S. 425; *Second Employers' Liability Cases,* 223 U. S. 1; *Noble State Bank* v. *Haskell,* 219 U. S. 104; s. c., 219 U. S. 575; *Arizona Employers' Liability Cases,* 250 U. S. 400; *Gilbert* v. *Minnesota,* 254 U. S. 325; *Wilson* v. *New,* 243 U. S. 332; *Block* v. *Hirsh,* 256 U. S. 135; *State* v. *Sperry,* 94 Neb. 785; *Matter of Gregory,* 219 U. S. 216; *Rast* v. *Van Deman & Lewis Co.,* 240 U. S. 342; *Pitney* v. *Washington,* 240 U. S. 387; *Tanner* v. *Little,* 240 U. S. 369.

The statute does not unlawfully interfere with the defendant's occupation as a teacher. *Mugler* v. *Kansas,* 123 U. S. 623; *Wenham* v. *State,* 65 Neb. 395; *Muller* v. *Oregon,* 208 U. S. 412; *Barbier* v. *Connolly,* 113 U. S. 27; *Slaughter-House Cases,* 16 Wall. 36; *Chicago, Burlington & Quincy R. R. Co.* v. *McGuire,* 219 U. S. 549.

The statute does not deny defendant the equal protection of the law. *Nebraska District of Evangelical Synod* v. *McKelvie,* 187 N. W. 927; *Miller* v. *Wilson,* 236 U. S. 373; *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S. 61; *Johnston* v. *Kennecott Copper Co.,* 248 Fed. 407; *Halter* v. *Nebraska,* 205 U. S. 34; *Quong Wong* v. *Kirkendall,* 223 U. S. 59; *Wilson* v. *New,* 243 U. S. 332; *Pitney* v. *Washington,* 240 U. S. 387; *Tanner* v. *Little,* 240 U. S. 369; *McLean* v. *Arkansas,* 211 U. S. 539; *Lower Vein Coal Co.* v. *Industrial Board,* 255 U. S. 144.

*Mr. William D. Guthrie* and *Mr. Bernard Hershkopf,* by leave of court, filed a brief as *amici curiæ.*

MR. JUSTICE McREYNOLDS delivered the opinion of the Court.

Plaintiff in error was tried and convicted in the District Court for Hamilton County, Nebraska, under an information which charged that on May 25, 1920, while an instructor in Zion Parochial School, he unlawfully taught the subject of reading in the German language to Raymond Parpart, a child of ten years, who had not attained

and successfully passed the eighth grade. The information is based upon "An act relating to the teaching of foreign languages in the State of Nebraska," approved April 9, 1919, which follows [Laws 1919, c. 249.] :

" Section 1. No person, individually or as a teacher, shall, in any private, denominational, parochial or public school, teach any subject to any person in any language other than the English language.

" Sec. 2. Languages, other than the English language, may be taught as languages only after a pupil shall have attained and successfully passed the eighth grade as evidenced by a certificate of graduation issued by the county superintendent of the county in which the child resides.

" Sec. 3. Any person who violates any of the provisions of this act shall be deemed guilty of a misdemeanor and upon conviction, shall be subject to a fine of not less than twenty-five dollars ($25), nor more than one hundred dollars ($100) or be confined in the county jail for any period not exceeding thirty days for each offense.

" Sec. 4. Whereas, an emergency exists, this act shall be in force from and after its passage and approval."

The Supreme Court of the State affirmed the judgment of conviction.   107 Neb. 657.   It declared the offense charged and established was " the direct and intentional teaching of the German language as a distinct subject to a child who had not passed the eighth grade," in the parochial school maintained by Zion Evangelical Lutheran Congregation, a collection of Biblical stories being used therefor.   And it held that the statute forbidding this did not conflict with the Fourteenth Amendment, but was a valid exercise of the police power.   The following excerpts from the opinion sufficiently indicate the reasons advanced to support the conclusion.

" The salutary purpose of the statute is clear.   The legislature had seen the baneful effects of permitting for-

eigners, who had taken residence in this country, to rear
and educate their children in the language of their native
land. The result of that condition was found to be
inimical to our own safety. To allow the children of
foreigners, who had emigrated here, to be taught from
early childhood the language of the country of their par-
ents was to rear them with that language as their mother
tongue. It was to educate them so that they must always
think in that language, and, as a consequence, naturally
inculcate in them the ideas and sentiments foreign to the
best interests of this country. The statute, therefore,
was intended not only to require that the education of all
children be conducted in the English language, but that,
until they had grown into that language and until it had
become a part of them, they should not in the schools be
taught any other language. The obvious purpose of this
statute was that the English language should be and be-
come the mother tongue of all children reared in this state.
The enactment of such a statute comes reasonably within
the police power of the state. *Pohl* v. *State,* 132 N. E.
(Ohio) 20; *State* v. *Bartels,* 181 N. W. (Ia.) 508.

"It is suggested that the law is an unwarranted re-
striction, in that it applies to all citizens of the state and
arbitrarily interferes with the rights of citizens who are
not of foreign ancestry, and prevents them, without reason,
from having their children taught foreign languages in
school. That argument is not well taken, for it assumes
that every citizen finds himself restrained by the statute.
The hours which a child is able to devote to study in the
confinement of school are limited. It must have ample
time for exercise or play. Its daily capacity for learning
is comparatively small. A selection of subjects for its
education, therefore, from among the many that might
be taught, is obviously necessary. The legislature no
doubt had in mind the practical operation of the law.
The law affects few citizens, except those of foreign line-

age. Other citizens, in their selection of studies, except perhaps in rare instances, have never deemed it of importance to teach their children foreign languages before such children have reached the eighth grade. In the legislative mind, the salutary effect of the statute no doubt outweighed the restriction upon the citizens generally, which, it appears, was a restriction of no real consequence."

The problem for our determination is whether the statute as construed and applied unreasonably infringes the liberty guaranteed to the plaintiff in error by the Fourteenth Amendment. "No State shall . . . deprive any person of life, liberty, or property, without due process of law."

While this Court has not attempted to define with exactness the liberty thus guaranteed, the term has received much consideration and some of the included things have been definitely stated. Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men. *Slaughter-House Cases,* 16 Wall. 36; *Butchers' Union Co.* v. *Crescent City Co.,* 111 U. S. 746; *Yick Wo* v. *Hopkins,* 118 U. S. 356; *Minnesota* v. *Barber,* 136 U. S. 313; *Allgeyer* v. *Louisiana,* 165 U. S. 578; *Lochner* v. *New York,* 198 U. S. 45; *Twining* v. *New Jersey,* 211 U. S. 78; *Chicago, Burlington & Quincy R. R. Co.* v. *McGuire,* 219 U. S. 549; *Truax* v. *Raich,* 239 U. S. 33; *Adams* v. *Tanner,* 244 U. S. 590; *New York Life Ins. Co.* v. *Dodge,* 246 U. S. 357; *Truax* v. *Corrigan,* 257 U. S. 312; *Adkins* v. *Children's Hospital,* 261 U. S. 525; *Wyeth* v. *Cambridge Board of Health,* 200 Mass. 474. The established doctrine is that this liberty may not be inter-

fered with, under the guise of protecting the public interest, by legislative action which is arbitrary or without reasonable relation to some purpose within the competency of the State to effect. Determination by the legislature of what constitutes proper exercise of police power is not final or conclusive but is subject to supervision by the courts. *Lawton* v. *Steele,* 152 U. S. 133, 137.

The American people have always regarded education and acquisition of knowledge as matters of supreme importance which should be diligently promoted. The Ordinance of 1787 declares, " Religion, morality, and knowledge being necessary to good government .and the happiness of mankind, schools and the means of education shall forever be encouraged." Corresponding to the right of control, it is the natural duty of the parent to give his children education suitable to their station in life; and nearly all the States, including Nebraska, enforce this obligation by compulsory laws.

Practically, education of the young is only possible in schools conducted by especially qualified persons who devote themselves thereto. The calling always has been regarded as useful and honorable, essential, indeed, to the public welfare. Mere knowledge of the German language cannot reasonably be regarded as harmful. Heretofore it has been commonly looked upon as helpful and desirable. Plaintiff in error taught this language in school as part of his occupation. His right thus to teach and the right of parents to engage him so to instruct their children, we think, are within the liberty of the Amendment.

The challenged statute forbids the teaching in school of any subject except in English; also the teaching of any other language until the pupil has attained and successfully passed the eighth grade, which is not usually accomplished before the age of twelve. The Supreme Court of the State has held that " the so-called ancient or dead languages " are not " within the spirit or the purpose of

the act." *Nebraska District of Evangelical Lutheran Synod* v. *McKelvie,* 187 N. W. 927.. Latin, Greek, Hebrew are not proscribed; but German, French, Spanish, Italian and every other alien speech are within the ban. Evidently the legislature has attempted materially to interfere with the calling of modern language teachers, with the opportunities of pupils to acquire knowledge, and with the power of parents to control the education of their own.

It is said the purpose of the legislation was to promote civic development by inhibiting training and education of the immature in foreign tongues and ideals before they could learn English and acquire American ideals; and "that the English language should be and become the mother tongue of all children reared in this State." It is also affirmed that the foreign born population is very large, that certain communities commonly use foreign words, follow foreign leaders, move in a foreign atmosphere, and that the children are thereby hindered from becoming citizens of the most useful type and the public safety is imperiled.

That the State may do much, go very far, indeed, in order to improve the quality of its citizens, physically, mentally and morally, is clear; but the individual has certain fundamental rights which must be respected. The protection of the Constitution extends to all, to those who speak other languages as well as to those born with English on the tongue. Perhaps it would be highly advantageous if all had ready understanding of our ordinary speech, but this cannot be coerced by methods which conflict with the Constitution—a desirable end cannot be promoted by prohibited means.

For the welfare of his Ideal Commonwealth, Plato suggested a law which should provide: " That the wives of our guardians are to be common, and their children are to be common, and no parent is to know his own child,

nor any child his parent. . . . The proper officers will take the offspring of the good parents to the pen or fold, and there they will deposit them with certain nurses who dwell in a separate quarter; but the offspring of the inferior, or of the better when they chance to be deformed, will be put away in some mysterious, unknown place, as they should be." In order to submerge the individual and develop ideal citizens, Sparta assembled the males at seven into barracks and intrusted their subsequent education and training to official guardians. Although such measures have been deliberately approved by men of great genius, their ideas touching the relation between individual and State were wholly different from those upon which our institutions rest; and it hardly will be affirmed that any legislature could impose such restrictions upon the people of a State without doing violence to both letter and spirit of the Constitution.

 The desire of the legislature to foster a homogeneous people with American ideals prepared readily to understand current discussions of civic matters is easy to appreciate. Unfortunate experiences during the late war and aversion toward every characteristic of truculent adversaries were certainly enough to quicken that aspiration. But the means adopted, we think, exceed the limitations upon the power of the State and conflict with rights assured to plaintiff in error. The interference is plain enough and no adequate reason therefor in time of peace and domestic tranquility has been shown.

 The power of the State to compel attendance at some school and to make reasonable regulations for all schools, including a requirement that they shall give instructions in English, is not questioned. Nor has challenge been made of the State's power to prescribe a curriculum for institutions which it supports. Those matters are not within the present controversy. Our concern is with the prohibition approved by the Supreme Court. *Adams* v.

*Tanner, supra,* p. 594, pointed out that mere abuse incident to an occupation ordinarily useful is not enough to justify its abolition, although regulation may be entirely proper. No emergency has arisen which renders knowledge by a child of some language other than English so clearly harmful as to justify its inhibition with the consequent infringement of rights long freely enjoyed. We are constrained to conclude that the statute as applied is arbitrary and without reasonable relation to any end within the competency of the State.

As the statute undertakes to interfere only with teaching which involves a modern language, leaving complete freedom as to other matters, there seems no adequate foundation for the suggestion that the purpose was to protect the child's health by limiting his mental activities. It is well known that proficiency in a foreign language seldom comes to one not instructed at an early age, and experience shows that this is not injurious to the health, morals or understanding of the ordinary child.

The judgment of the court below must be reversed and the cause remanded for further proceedings not inconsistent with this opinion.

*Reversed.*

[See the separate opinion of MR. JUSTICE HOLMES, concurred in by MR. JUSTICE SUTHERLAND, in the next case, at p. 412, *infra.*]