Jane DOE and Herbert F. Sandmire, M.D.,
Plaintiffs-Appellees,

v.

BELLIN MEMORIAL HOSPITAL et al.,
Defendants-Appellants.

No. 73–1396.

United States Court of Appeals,
Seventh Circuit.

Argued May 30, 1973.

Decided June 1, 1973.

Alexander R. Grant, Gregory B. Conway, Green Bay, Wis., for defendants-appellants.

Paul L. Jonjak, Sturgeon Bay, Wis., for plaintiffs-appellees.

Before KILEY, PELL and STEVENS, Circuit Judges.

STEVENS, Circuit Judge.

The district court ordered the defendant hospital to make its facilities and staff available to the plaintiff doctor for the immediate performance of an abortion on the plaintiff, Jane Doe. We stayed that order and expedited defendants' appeal. The ultimate issue is whether the defendants, who are regulated by the State of Wisconsin and have accepted financial support pursuant to the Hill-Burton Act, 42 U.S.C. § 291, may refuse to perform abortions without offending the Civil Rights Act, 42 U.S.C. § 1983. We hold that they may, since the record does not indicate that their refusal was directly or indirectly influenced by the State or by persons acting under color of State law.

On April 26, 1973, plaintiff filed a verified complaint, together with the affidavit of Dr. Sandmire, plaintiff Doe's attending physician and a member of the staff of the defendant hospital. For purposes of decision we accept the facts as stated in those documents notwithstanding defendants' objection to the district court's refusal to hear their witnesses.[1] These facts are fairly summarized in plaintiffs' brief from which we quote:

"This case arises from Bellin Memorial Hospital's refusal to permit use of its facilities for an abortion for Jane Doe and its enforcement of abortion-restricting rules.

"Jane Doe, a resident of Shawano County, Wisconsin, became pregnant on February 4, 1973, and was scheduled for an abortion in a Madison, Wisconsin, clinic on April 4, 1973, but could not keep the appointment because of a severe snow storm. Her pregnancy had advanced too far to permit a clinic abortion, so Jane Doe's personal physician referred her to Dr. Herbert F. Sandmire, who performed an examination on April 19, 1973. Dr. Sandmire determined, after consultation with his patient, that in his medical judgment, the patient's pregnancy should be terminated in a hospital.

"Practical considerations, such as time, distance, and expense, normally limit Dr. Sandmire's practice to Green Bay hospitals and he has practiced his profession at Bellin Memorial Hospital for a number of years. He contacted St. Vincent Hospital, St. Mary's Hospital, and Bellin Memorial Hospital, the only Green Bay hospitals with suitable facilities, to request their use for the operation, but in each instance his request was refused.

"Bellin Memorial Hospital informed Dr. Sandmire it was enforcing rules restricting abortions to cases where pregnancy would: seriously threaten the health or life of the mother, or re-

---

1. We assume that the witnesses tendered by the defendants would have amplified or explained plaintiffs' version of the facts, but since they did not submit any affidavits of their own, and we find no offer of proof contradicting the plaintiffs' statements, we conclude that defendants were not prejudiced by the abbreviated character of the record. The question is whether the record which plaintiffs made is adequate to support the injunctive relief granted by the district court.

sult in delivery of an infant with grave and irreparable physical deformity or mental retardation, or if the pregnancy has resulted from legally established rape or incest. These rules make no provision for seeking consent from a putative father. All abortions are to be reviewed by a medical committee which then reports to the staff and Board of Directors.

"Bellin Memorial Hospital is regulated by the state, has received funding under the Hill-Burton Act from the federal government and has been an agency through which the State of Wisconsin and the United States Government have provided medical services for residents of Northeastern Wisconsin, but the hospital is now denying Jane Doe and Dr. Sandmire use of its facilities by enforcing abortion-restricting rules virtually identical to those [required by portions of the Georgia statute] declared unconstitutional [in Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201, on January 22, 1973]. In the past it has denied Dr. Sandmire use of its facilities for an abortion restricted by these rules, it has denied the facilities for Jane Doe because of these rules, and apparently it intends to continue to enforce these rules against Dr. Sandmire's patients in the future.

"Every passing day increases the medical risk to Jane Doe and at the time of Dr. Sandmire's examination, she was nearing the end of her first trimester of pregnancy on May 4, 1973, at which point medical risks increase dramatically.

"Dr. Sandmire and Jane Doe, therefore, brought this action against Bellin Memorial Hospital and certain of its officials and agents seeking: [an injunction restraining defendants from denying the use of their facilities for an abortion to be performed on Jane Doe or any other patients of Dr. Sandmire in the future, and for certain other relief]." [2]

On May 2, 1973, the district court granted a preliminary injunction. Because we seriously doubted that plaintiffs would ultimately succeed on the merits, and saw a practical risk that immediate performance of the abortion might result in a termination of the litigation in advance of appellate review, we granted defendants' application for a stay on May 3.[3] We now reverse.

## I.

Defendants argue that we should not reach the merits because plaintiffs have failed (a) to join the putative father as a party, or (b) to establish irreparable harm. We are not persuaded by either of these arguments.

In Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), the Supreme Court held that the right to make the "abortion decision" is an aspect of "liberty" protected by the Due Process Clause of the Fourteenth Amendment. In both Mr. Justice Blackmun's opinion for the Court [4] and Mr. Justice Stewart's concurring opinion, the possessor of that right is plainly identified as the woman; no reference is made to the putative father. The analysis in Eisenstadt v. Baird, 405 U.S. 438, 453, 92 S.Ct. 1029, 31 L.Ed.2d 349 from which Mr. Justice Stewart quoted, plainly indicates that the constitutionally protected right

---

2. We have supplied the bracketed words.

3. On May 4, the United States Supreme Court denied appellees' motion to vacate the stay.

4. "This right of privacy whether it be founded in the Fourteenth Amendment's concept of personal liberty and restrictions upon state action, as we feel it is, or, as the District Court determined, in the Ninth Amendment's reservation of

rights to the people, is broad enough to encompass a woman's decision whether or not to terminate her pregnancy.
* * * * *
"We therefore conclude that the right of personal privacy includes the abortion decision, but that this right is not unqualified and must be considered against important state interests in regulation." 410 U.S. at 153, 93 S.Ct. at 727.

of privacy is an individual rather than a joint right. He stated:

"As recently as last Term, in Eisenstadt v. Baird, 405 U.S. 438, 453, [92 S.Ct. 1029, 1038, 31 L.Ed.2d 349], we recognized 'the right of the *individual* married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child.' That right necessarily includes the right of a woman to decide whether or not to terminate her pregnancy.

\*       \*       \*       \*       \*       \*

"Clearly, therefore, the Court today is correct in holding that the right asserted by Jane Roe is embraced within the personal liberty protected by the Due Process Clause of the Fourteenth Amendment." 410 U.S. at 169, 93 S. Ct. at 735 (Mr. Justice Stewart concurring).

■ We find nothing in these opinions to support the suggestion that the woman's right to make the abortion decision is conditioned on the consent of the putative father.[5] In fact, the conclusion that the word "person," as used in the Fourteenth Amendment, does not include the unborn (at p. 729), points in the other direction and serves to distinguish Stanley v. Illinois, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551, on which defendants rely. The putative father, whoever he may be, is not an indispensable party.

■ Defendants argue that plaintiff has not proved irreparable injury because the record does not foreclose the possibility that she could travel to another community and obtain the care she needs.[6] But if she has a federal right to have the operation performed in Bel-

lin Memorial Hospital, where her doctor is a member of the staff, and if, as her doctor has attested, there are increasingly serious hazards associated with the performance of the abortion, it is doubtful that the recovery of purely monetary damages would provide her with an adequate remedy. The quality, rather than the magnitude, of the potential risks supports the district court's evaluation of the character of her possible injury as "irreparable". In view of the sensitive interests at stake, we are persuaded that the record contains an adequate showing of the element of irreparable damage needed for preliminary injunctive purposes. We therefore turn to the merits.

## II.

■ A woman's right to make the abortion decision is protected by the Fourteenth Amendment from deprivation by a state. For that reason a statute which makes the performance of an abortion a crime, Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 1471 (1973), or which *requires* the medical profession to observe unnecessary abortion-restricting rules, Doe v. Bolton, 410 U.S. 179, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), is invalid. The rationale of those cases has also been applied to rules adopted by the Worcester City Hospital, Hathaway v. Worcester City Hospital, 475 F.2d 701 (1st Cir. 1973), and by the New York Commissioner of Social Services, Klein, et al. v. Nassau County Medical Center, et al., 347 F.Supp. 496 (E. D.N.Y.1972).

■ The rationale of those cases is, however, inapplicable to private institutions. There is no constitutional objection to the decision by a purely private hospital that it will not permit its facili-

---

5. We note, however, that the Supreme Court expressly reserved decision on any question relating to rights of the putative father, "if any exist in the constitutional context." See Roe v. Wade, 410 U.S. 113, at 165, 93 S.Ct. 705, at 733. 35 L.Ed.2d 1471.

6. We note in this connection that plaintiff Jane Doe intended to go to Madison on April 4 for a clinic abortion but was unable to do so because of the weather. There is nothing in the record indicating that she could not now travel to Madison or some other city containing adequate hospital facilities.

ties to be used for the performance of abortions. We think it is also clear that if a state is completely neutral on the question whether private hospitals shall perform abortions, the state may expressly authorize such hospitals to answer that question for themselves.

The Georgia abortion statute which was reviewed in detail in Doe v. Bolton, *supra*, contained such a provision. The Supreme Court did not expressly pass on the validity of that provision, but since it was attacked in one of the amicus briefs,[7] and since the Court reviewed the entire statute in such detail, it is reasonable to infer that it considered such authorization unobjectionable. After summarizing the other provisions of the Georgia statute, the Court noted:

"There is also a provision (subsection (e) ) giving a hospital the right not to admit an abortion patient and giving any physician and any hospital employee or staff member the right, on moral or religious grounds not to participate in the procedure." 410 U. S. at 184, 93 S.Ct. at 743.[8]

And in connection with its discussion of the statutory requirement of approval for abortions by a hospital committee, the Court stated:

"We are not cited to any other surgical procedure made subject to committee approval as a matter of state criminal law. The woman's right to receive medical care in accordance with her licensed physician's best judgment and the physician's right to administer it are substantially limited by this statutorily imposed overview. And the hospital itself is otherwise fully protected. Under § 26–1202(e) the hospital is free not to admit a patient for an abortion. It is even free not to have an abortion committee. Further, a physician or any other employee has the right to refrain, for moral or religious reasons, from participating in the abortion procedure. These provisions obviously are in the statute in order to afford appropriate protection to the individual and to the denominational hospital. Section 26–1202(e) affords adequate protection to the hospital and little more is provided by the committee prescribed by § 26–1202(b)(5)." 410 U.S. 197, 93 S.Ct. 750.

■■ Thus, we assume that there is no constitutional objection to a state statute or policy which leaves a private hospital free to decide for itself whether or not it will admit abortion patients or to determine the conditions on which such patients will be accepted. Plaintiffs contend, however, that the hospital's right to make that decision has been limited by two federal statutes, the Hill-Burton Act[9] and § 1 of the Civil Rights Act of 1871, now 42 U.S.C. § 1983.[10] We are not persuaded that ei-

7. Brief amici curiae on behalf of National Legal Program on Health Problems of the Poor, pp. 48–52.

8. The full text of subsection (e) reads as follows:
   "(e) Nothing in this section shall require a hospital to admit any patient under the provisions hereof for the purpose of performing an abortion, nor shall any hospital be required to appoint a committee such as contemplated under subsection (b)(5). A physician, or any other person who is a member of or .associated with the staff of a hospital, or any employee of a hospital in which an abortion has been authorized, who shall state in writing an objection to such abortion on moral or

religious grounds shall not be required to participate in the medical procedures which will result in the abortion, and the refusal of any such person to participate therein shall not form the basis of any claim for damages on account of such refusal or for any disciplinary or recriminatory action against such person.

9. 42 U.S.C. §§ 291–291z.

10. Section 1983 provides:
    "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges,

ther of those statutes, or the two in combination, have that effect.

No doubt the defendant hospital agreed to abide by a variety of regulatory terms related both to its operations and to the use of the Hill-Burton funds in connection with its acceptance of benefits under that Act. There is no evidence, however, that any condition related to the performance or non-performance of abortions was imposed upon the hospital. Unlike the fact situation in Simkins v. Moses H. Cone Memorial Hospital, 323 F.2d 959 (4th Cir. 1963), on which plaintiffs place heavy reliance, this record does not reflect any governmental involvement in the very activity which is being challenged.[11] We find no basis for concluding that by accepting Hill-Burton funds the hospital unwittingly surrendered the right it otherwise possessed to determine whether it would accept abortion patients.

Nor do we believe that the implementation of defendant's own rules relating to abortions is action "under color of" state law within the meaning of § 1983. The State of Wisconsin is not a beneficiary of those rules and cannot be characterized as a "joint participant" in their adoption or enforcement. *Cf.* Burton v. Wilmington Parking Authority, 365 U.S. 715, 724–725, 81 S.Ct.

856, 6 L.Ed.2d 45. There is no claim that the state has sought to influence hospital policy respecting abortions, either by direct regulation or by discriminatory application of its powers or its benefits. Insofar as action of the State of Wisconsin or its agents is disclosed by the record, the State has exercised no influence whatsoever on the decision of the defendants which plaintiffs challenge in this litigation.

The facts that defendants have accepted financial support, as alleged, from both the federal and state governments, and that the hospital is subject to detailed regulation by the State, do not justify the conclusion that its conduct, which is unaffected by such support or such regulation, is governed by § 1983. In Lucas v. Wisconsin Electric Power Co., 466 F.2d 638 (7th Cir. 1972), we rejected a stronger argument for application of that statute to a public utility. We stated:

"The 'under color of' provision encompasses only such private conduct as is supported by state action. That support may take various forms, but it is quite clear that a private person does not act under color of state law unless he derives some 'aid, comfort, or incentive,' either real or apparent, from the state. Absent such affirma-

---

or immunities secured by the Consitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

11. In that case the Fourth Circuit pointed out:

"Significant duties are imposed on the Surgeon General with respect to the 'Non-Discrimination Report.' 42 C.F.R. § 53.112 provides that a state agency's findings must be approved by the Surgeon General. Consequently, the Surgeon General has the duty of determining whether the state agency has properly applied the 'separate-but-equal' formula, *i. e.,* whether the state's plan actually makes 'equitable provision' for all population groups. The 'Non-Discrimination Report' submitted by the North Carolina Medical Care Commission on January 3, 1962, was approved

by the Surgeon General on January 22, 1962.

"The point of present interest is not the equality or lack of equality 'separate-but-equal,' but the degree of participation by the national and state governments in the geographical proration of hospital facilities throughout the state.

\*        \*        \*        \*        \*

"Moreover, the Government's argument stresses the fact that the challenged discrimination has been affirmatively sanctioned by both the state and the federal government pursuant to federal law and regulation. 42 U.S.C.A. § 291e(f); 42 C.F.R. § 53.112. It is settled that governmental sanction need not reach the level of compulsion to clothe what is otherwise private discrimination with 'state action.'" 323 F.2d at 965, 968.

tive support, the statute is inapplicable to private conduct.

"We believe that affirmative support must be significant, measured either by its contribution to the effectiveness of defendant's conduct, or perhaps by its defiance of conflicting national policy, to bring the statute into play. There is no such significant affirmative state support of Wisconsin Electric's proposed termination of plaintiff's service." 466 F.2d at 654–656.

See also Bright v. Isenbarger, 445 F. 2d 412 (7th Cir. 1971); Powe v. Miles, 407 F.2d 73, 81 (2d Cir. 1968);[12] Mulvihill v. Butterfield Mem. Hosp., 329 F. Supp. 1020 (S.D.N.Y.1971). *Contra,* Citta v. Delaware Valley Hosp., 313 F. Supp. 301 (E.D.Pa.1970).

Plaintiffs argue that if Hill-Burton funds had not been allocated to defendant and other private hospitals, those funds would have been used to expand or construct public facilities which could not refuse to admit abortion patients. Even if this be true, the availability of alternate public hospitals would not vindicate the right plaintiff asserts in this case. She claims, in essence, the right to compel Bellin Memorial Hospital to make its facilities available to her. Her claim of irreparable injury forecloses any assumption that a hypothetical substitute would be adequate to serve her needs. Her claimed right to have the abortion performed at the hospital of her choice has not been impaired by that hospital's acceptance of Hill-Burton funds.

The order of the district court is Reversed.

---

12. Judge Friendly there stated:

"The contention that New York's regulation of educational standards in private schools, colleges and universities, e. g., Education Law §§ 207, 215, 305(2), makes their acts in curtailing protest and *disciplining students* the acts of the State is equally unpersuasive. It overlooks the essential point—that the state must be involved not simply with some activity of the institution, alleged to have inflicted injury upon a plaintiff but with the activity that caused the injury. Putting the point another way, the state action, not the private action, must be the subject of complaint. See Burton v. Wilmington Parking Authority, supra, 365 U.S. at 725, 81 S.Ct. 856, 6 L.Ed.2d 45; Grossner v. Trustees of Columbia University, 287 F.Supp. 535, 548 (S.D. N.Y.1968). When the state bans a subject from the curriculum of a private school, as in Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), its responsibility needs no elucidation. State action would be similarly present here with respect to all the students if New York had undertaken to set policy for the control of demonstrations in all private universities or in universities containing contract colleges. Cf. Public Utilities Comm'n of District of Columbia v. Pollak, 343 U.S. 451, 461–463, 72 S.Ct. [813] 96 (*sic*) L.Ed. 1068 (1952). But the fact that New York has exercised some regulatory powers over the standard of education offered by Alfred University does not implicate it generally in Alfred's policies toward demonstrations and discipline."