WILLIAM RENFORTH, M.D. *v.* THE FAYETTE MEMORIAL HOSPITAL ASSOCIATION, INC., BOARD OF TRUSTEES OF FAYETTE MEMORIAL HOSPITAL ASSOCIATION, INC., EXECUTIVE COMMITTEE OF THE BOARD OF TRUSTEES OF FAYETTE MEMORIAL HOSPITAL ASSOCIATION, INC., EXECUTIVE COMMITTEE OF THE MEDICAL STAFF OF FAYETTE MEMORIAL HOSPITAL, EARL BRANSON, JOHN J. DARCY, K. DALE FORD, RUSSELL ARCHIBOLD, CHARLES R. BOTTORFF, MARTHA F. KENNEDY, LA VERNE L. MARSH, F. B. MOUNTAIN, J. M. LOCKHART, ALBERT ROBINSON, WILLIS ROSE, HENRY RUHL, KATHLENE SHAVER, DALE SLONEKER, EDWARD THIELKING, WILLIAM THOMAS, R. HIRSCH, R. TAUBE, Z. MUFTI, R. W. SANDERS

[No. 1-877A165. Filed December 12, 1978. Rehearing denied January 16, 1979. Transfer denied June 6, 1979.]

*David W. Dennis, Dennis, Reinke & Vertesch*, of Richmond, *Kent Masterson Brown*, of Lexington, Kentucky, for appellant.

*Ralph A. Cohen, Joan Godlove, Ice, Miller, Donadio & Ryan*, of Indianapolis, for appellee. *William S. Hall, Hall, Render & Helbert*, of In-

dianapolis, attorneys for Amicus Curiae Indiana Hospital Association, Inc.

## STATEMENT OF THE CASE

LOWDERMILK, J. — Plaintiffs-appellants William Renforth appeals after the Union Circuit Court entered judgment in favor of defendant-appellee Fayette Memorial Hospital Association (Hospital), *et al.*, in a lawsuit challenging Hospital's bylaw which requires all members of Hospital's medical staff to carry professional liability insurance coverage.

## FACTS

Dr. Renforth was terminated as a member of Hospital's medical staff on April 1, 1976, because he failed to acquire professional liability insurance coverage, as required by Hospital's bylaws. He filed suit in Fayette Circuit Court against Hospital, its Board of Trustees, the Executive Committee of its Board of Trustees, and the Executive Committee of its medical staff, seeking a restraining order, preliminary and permanent injunctions, and damages. The suit was transferred to Union Circuit Court on change of venue, where the trial court ultimately entered judgment in favor of all defendants.

We affirm.

## ISSUES

1. Did the trial court lose jurisdiction when it violated Ind. Rules of Procedure, Trial Rule 79?

2. Is Hospital a public institution, in the sense that its actions constitute state action and are governed by and subject to the Due Process Clause of the Fifth and Fourteenth Amendments to the Constitution of the United States?

3. Did Hospital act unlawfully, arbitrarily, and capriciously in imposing the insurance requirement?

*Issue One*

Dr. Renforth contends that the Union Circuit Court lost jurisdiction of this cause of action when Judge James S. Shepard violated TR. 79(1)(b).

Dr. Renforth's lawsuit against Hospital was transferred on change of venue to the Union Circuit Court on May 12, 1976. On January 1, 1977, TR. 79 became effective to provide as follows:

"(1)   Whenever the regular judge or presiding judge of any court or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such person.

\* \* \*

(b)   Is acting as a lawyer in the proceeding, . . .

\* \* \*

the venue of which is before such judge, he shall disqualify himself immediately and cause such fact to be certified to the Supreme Court which shall thereupon appoint a special judge.

\* \* \*"

The cause came on for trial, without intervention of a jury, on January 18, 1977. The trial court rendered judgment in favor of all defendants on February 2, 1977. Dr. Renforth filed his motion to correct errors on March 31, 1977, which the trial court overruled on May 19, 1977.

On May 20, 1977, Dr. Renforth filed his motion for change of judge, based upon TR. 79(1)(b). The judge of the Union Circuit Court is the father-in-law of one of the attorneys who represented Hospital in the trial court proceeding. The trial court did not rule on the motion. Dr. Renforth instituted an original action in the Supreme Court on May 31, 1977, claiming that the trial court had no jurisdiction in the cause of action because of the violation of TR. 79. The Supreme Court held that Dr. Renforth should have brought his jurisdictional claim to that court prior to final judgment. Justice DeBruler wrote, at 369 N.E.2d 1078:   "As relator did not avail himself of this opportunity, his remedy is by way of appeal."

Dr. Renforth, accordingly, presents the following issue on appeal:   Is TR. 79(1)(b) mandatory and will violation thereof divest the trial court of jurisdiction?

If a court has jurisdiction of the class of actions to which a particular case belongs, the court has jurisdiction of the subject matter of the action.

When a court does not have subject matter jurisdiction, the parties cannot confer such jurisdiction by consent. *Farley v. Farley* (1973), 157 Ind.App. 385, 300 N.E.2d 375.

> If a court does have jurisdiction of the subject matter of the action, the parties may give consent, express or implied, to jurisdiction of the particular case. *Farley v. Farley, supra.*

Dr. Renforth does not challenge the jurisdiction of the Union Circuit Court to entertain the class of actions to which his particular case belongs. He contends that the Union Circuit Court, by violating TR. 79(1)(b), lost jurisdiction of his particular case.

An affidavit signed by the attorney who represented Dr. Renforth in the trial court proceeding reveals that Dr. Renforth's attorney became aware of the relationship existing between the judge and one of Hospital's attorneys in August or September 1976. The effective date of TR. 79 was January 1, 1977, yet Dr. Renforth made no effort to challenge the jurisdiction of the trial court until more than three months after the trial court entered judgment adverse to him on February 2, 1977. Certainly these facts warrant a holding that Dr. Renforth gave implied consent to jurisdiction of his particular case, unless the wording of TR. 79 dictates a contrary conclusion.

TR. 79 does provide that the trial court judge *shall* disqualify himself when he is closely related to one of the attorneys participating in the action. Obviously, Judge Shepard was in a far better position to know of the relationship than was Dr. Renforth. We cannot ignore the fact, however, that Dr. Renforth's attorney did in fact know of the relationship and did permit the matter to go to trial without objection.

A complete reading of TR. 79 reveals that its primary purpose is to set forth a procedure for selecting special judges rather than to define who shall and who shall not be eligible to sit as judge in a particular case. The rule should be enforced in a manner that does not emasculate the unambiguous wording contained therein, but it should also be enforced in a manner which prevents a party with knowledge of the relationship from remaining silent until he suffers an adverse judgment.

With these considerations in mind, along with due regard for the rule

that consent to jurisdiction of a particular case can be given impliedly, we deem it to be appropriate to enforce TR. 79(1)(b) as follows: A judge has a duty to disqualify himself when he or his spouse, or a person within the third degree of relationship to either of them, or the spouse of such person is acting as a lawyer in the proceeding. Failure of the judge to disqualify himself will not result in loss of jurisdiction, however, if the party who raises the issue on appeal knew, or had reason to know, of the relationship prior to the time final judgment was entered.[1]

We hold that Dr. Renforth impliedly consented to the jurisdiction of the Union Circuit Court.

*Issue Two*

Fayette Memorial Hospital is organized as a private, not-for-profit hospital. Dr. Renforth contends that Hospital, for a number of reasons, has become a public institution in the sense that its actions constitute state action and are governed by and subject to the Due Process Clause of the Fifth and Fourteenth Amendments to the Constitution of the United States.

The Due Process Clause of the Fourteenth Amendment provides: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law; . . ." The Due Process Clause applies to state action, but it offers no shield against private conduct regardless of how wrongful such private conduct may be. *Jackson v. Metropolitan Edison Co.* (1974), 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477; *Shelley v. Kraemer* (1948), 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161. As the Supreme Court noted in *Jackson v. Metropolitan Edison Co., supra,* at 95 S.Ct. 449, 453:

> ". . . While the principle that private action is immune from the restrictions of the Fourteenth Amendment is well established and easily stated, the question whether particular conduct is 'private,' on the one hand, or 'state action,' on the other, frequently admits of no easy answer. . . ."

---

1. If, for example, the judge and one of the attorneys shared the same name, that fact would be sufficient cause for a person to make inquiry; failure to make inquiry would amount to waiver of the issue.

Dr. Renforth first argues that Hospital's action is state action because Hospital has accepted governmental funds and thereby subjected itself to governmental regulation.

The impetus for the challenged activity need not originate with the state. State action may be found if the state simply enforces the activity which originates privately. *Moose Lodge No. 107 v. Irvis* (1972), 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627. However, a nexus must exist between the governmental involvement and the particular activity being challenged. *Doe v. Bellin Memorial Hospital* (7th Cir. 1973), 479 F.2d 756.[2] Or the evidence must show that the state "has so far insinuated itself into a position of interdependence" with the private institution that the state has become "a joint participant" in the challenged activity. *Burton v. Wilmington Parking Authority* (1961), 365 U.S. 715, 81 S.Ct. 856, 862, 6 L.Ed.2d 45.

In *Doe v. Bellin Memorial Hospital, supra,* Jane Doe and her physician brought an action seeking an injunction to prevent a hospital and its officials from denying use of the facilities for an abortion. She argued that the hospital acted "under color of" state law within the meaning of the civil rights statutes because it accepted financial support provided through state and federal programs and thereby subjected itself to detailed regulation.

The Honorable John Paul Stevens, who was then Judge for the Seventh Circuit Court of Appeals, penned the opinion in the case. First he noted that no nexus existed between receipt of governmental funding and the hospital's rule prohibiting the performance of abortions:

"* * *

No doubt the defendant hospital agreed to abide by a variety

2. In *Jackson v. Metropolitan Edison Co.* (1974), 419 U.S. 345, 95 S.Ct. 449, 457, 42 L.Ed.2d 477, petitioner alleged that she had been denied due process of law when the respondent, a privately owned utility company, terminated the electrical service to her home for nonpayment of bills without giving her prior notice of its proposed action. The Supreme Court held:

"... the State of Pennsylvania is not sufficiently connected with respondent's action in terminating petitioner's service so as to make respondent's conduct in so doing attributable to the State for purposes of the Fourteenth Amendment...."

of regulatory terms related both to its operations and to the use of the Hill-Burton funds in connection with its acceptance of benefits under that Act. There is no evidence, however, that any condition related to the performance or non-performance of abortions was imposed upon the hospital. Unlike the fact situation in Simkins v. Moses H. Cone Memorial Hospital, 323 F.2d 959 (4th Cir. 1963), on which plaintiffs place heavy reliance, *this record does not reflect any governmental involvement in the very activity which is being challenged.* We find no basis for concluding that by accepting Hill-Burton funds the hospital unwittingly surrendered the right it otherwise possessed to determine whether it would accept abortion patients.

* * *" (Our emphasis)

(Footnote omitted)

Next he emphasized that the state had received no benefit as a result of the hospital's policy opposing abortions:

"* * *

Nor do we believe that the implementation of defendant's own rules relating to abortions is action 'under color of' state law within the meaning of § 1983. The State of Wisconsin is not a beneficiary of those rules and cannot be characterized as a 'joint participant' in their adoption or enforcement. Cf. Burton v. Wilmington Parking Authority, 365 U.S. 715, 724-725, 81 S.Ct. 856, 6 L.Ed.2d 45...."

Judge Stevens then summarized the reasoning of the court:

"... There is no claim that the state has sought to influence hospital policy respecting abortions, either by direct regulation or by discriminatory application of its powers or its benefits. Insofar as action of the State of Wisconsin or its agents is disclosed by the record, the State has exercised no influence whatsoever on the decision of the defendants which plaintiffs challenge in this litigation.

The facts that defendants have accepted financial support, as alleged, from both the federal and state governments, and that the hospital is subject to detailed regulation by the State, do not justify the conclusion that its conduct, which is unaffected by such support or such regulation, is governed by § 1983.[3] ..."

Dr. Renforth has painstakingly set forth summaries of the govern-

---

3. All quotations from *Doe v. Bellin Memorial Hospital, supra,* appear at 479 F.2d 761.

mental programs in which Hospital participated. Dr. Renforth has totally failed, however, to show any nexus between the governmental funds and programs, and the position taken by Hospital regarding professional liability insurance. Hospital's administrator specifically testified that no governmental entity influenced Hospital's decision to require insurance coverage for the members of its medical staff. Furthermore, the evidence reveals no interdependence between Hospital and the governmental bodies, as proved to be decisive in the case of *Burton v. Wilmington Parking Authority, supra.*

Dr. Renforth contends that the composition of Hospital's Board of Trustees converts the private hospital into a public institution.

Paragraph (6)6(f) of the Articles of Reorganization of Fayette Memorial Hospital Association provides:

"The Board of Trustees shall consist of seventeen (17) members. One (1) member shall be elected by the County Council of Fayette County; and one (1) member shall be elected by the Board of Commissions [sic] of Fayette County; one (1) member shall be elected by the Common Council of the City of Connersville, Indiana; two (2) members shall be medical doctors elected by the active medical staff of the Fayette Memorial Hospital; and twelve members shall be elected by the Council of the Association. . . ."

Hospital emphasizes that the first three members referred to in the paragraph set forth above are required to be elected *by*, not necessarily *from*, the governmental bodies. The trial court heard testimony that the three members elected by the County Council, the Board of Commissioners, and the Common Council acted independently and did not report to the governmental bodies which elected them.

Dr. Renforth has failed to prove state action based upon the composition of Hospital's seventeen-member Board of Trustees.

Dr. Renforth also argues that state action must be found because Hospital enjoys a monopoly position while performing a public function.

In *Barrett v. United Hospital* (S.D.N.Y. 1974), 376 F. Supp. 791, 799, *aff'd,* (2d Cir. 1974), 506 F.2d 1395, the court acknowledged that the acts of a private institution may be denominated state action when a private institution performs, pursuant to a right accorded by statute, a function performed traditionally by the state.

Judge Bauman concluded, however, that private hospitals do not perform a function traditionally performed by the goverment:

". . . Unlike fire departments and police departments mentioned by Justice Douglas in Evans v. Newton, supra [(1966), 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373] at 302, hospitals are not traditionally governmental. Private hospitals are the rule rather than the exception. It is only relatively recently that federal, state and local governments have recognized the need for widespread public health care. Traditionally, however, the provision of medical services has been a matter largely in the private domain. . . ." (Our insertion)

The court then considered the particular argument comparable to the one which Dr. Renforth presents in the case at bar:

"\* \* \*

Plaintiff . . . [stresses] that United Hospital is the *only* general hospital serving the area. As such, he argues, it operates in a quasi-public capacity, . . . . Even assuming this to be so, I cannot conclude that it makes the 'public function' theory applicable to the case at bar. That doctrine has heretofore been limited in its application to situations where the constitutional violation alleged occurred *in the very activity in which the private institution performed its 'traditionally governmental function'.*

This is not the case here. Even if it may be successfully argued that a private hospital is performing a public function it is clear that the function involved is the admission and treatment of patients, not the hiring and firing of doctors, nurses and other staff personnel. I find no compelling authority for extending the 'public function' argument to a private hospital in the absence of a nexus between the governmental function performed and the violative activity alleged." (Original emphasis) (Footnotes omitted) (Our insertion)

We do not rely solely upon *Barrett v. United Hospital, supra,* in resolving this issue. The United States Supreme Court in *Jackson v. Metropolitan Edison Co., supra,* held that there must be evidence of a relationship between the challenged action and the monopoly status before State action will be found.

Dr. Renforth has not shown a nexus between any purported governmenal function performed by Hospital and the insurance requirement which he challenges. His argument must fail.

Dr. Renforth refers to tax funds, bond proceeds, and Medicare and Medicaid payments which were paid to or otherwise benefitted Hospital. In each instance, however, Dr. Renforth has shown no nexus between those benefits and the insurance requirement.

Dr. Renforth and Hospital have cited a multitude of cases in support of their arguments. Having carefully considered the arguments presented, the authorities cited, and the evidence adduced during trial and by subsequent affidavits, we must hold that Dr. Renforth failed to present evidence proving that state action was involved in Hospital's decision and action to require members of its medical staff to carry professional liability insurance.[4]

*Issue Three*

Dr. Renforth contends that Hospital acted in an unlawful, arbitrary, and capricious manner when it imposed the insurance requirement.

In *Holmes v. Hoemako Hospital* (1977), 117 Ariz. 403, 573 P.2d 477, Dr. Holmes, the only doctor in Elroy, Arizona, brought suit against the only hospital serving the community and sought to have the hospital enjoined from enforcing against him its requirement that each member of its medical staff must show proof of professional liability insurance. After recognizing the right of the Arizona courts to engage in a narrow review of the procedural and substantive issues involved in the activities of the private, nonprofit hospital, the Arizona Supreme Court explained its test for determining whether the hospital's rule was reasonable or arbitrary: "did it pertain to the 'orderly management of the hospital and in most instances . . . [was it] . . . made for the protection of patients'?"[5] That court held that the hospital's requirement was not, *per se*, unlawful, arbitrary, or capricious:

"We cannot ignore the realities of modern procedural practice. If a patient is injured while in a hospital, regardless of who is at fault, the hospital will almost always be joined as a codefendant.

---

4.  In his brief Dr. Renforth attempts to provide evidence of a nexus. We remand Dr. Renforth that he must try his case and make his record in the trial court. The Court of Appeals is a court of review.

5.  573 P.2d 477, 479.

Despite the outcome of such an action, the hospital must expend valuable financial resources in its own defense, and will, if innocent of wrong-doing, be more likely to recover its expenses from the tort-feasor physician if that physician is insured. If, indeed, some conscientious lawyer decides not to include the hospital in an action where the finger of negligence points directly and solely to the doctor, we can be certain it will be only because the physician does indeed have malpractice insurance.

Nor can we ignore the realities of the situation where the doctor and hospital are found to be joint tort-feasors. We agree that there is no right to contribution between or among joint tort-feasors in Arizona. *Blakely Oil v. Crowder*, 80 Ariz. 72, 292 P.2d 842 (1956); *Chrysler Corp. v. McCarthy*, 14 Ariz. App. 536, 484 P.2d 1065 (1971). Practically speaking, however, it is not an uncommon solution to such joint liability for the insurers of both or all joint tort-feasors to contribute, in settlement or after verdict, to the fund which compensates the victim.

The hospital has the right to take reasonable measures to protect itself and the patients it serves. We cannot say, as a matter of law, that the hospital board's attention to its medical staff's malpractice insurance is unlawful, arbitrary or capricious. As a practical matter, we cannot say it is irrational or unreasonable. . . ."[6]

The Arizona court recognized, however, that such a requirement might be proved unreasonable in a particular case:

"* * *

This is not to say that in this matter an exception to the requirement might not be in order. We are well aware of the fact that the right to follow any lawful vocation or profession is constitutionally protected. *City of Tucson v. Stewart*, 45 Ariz. 36, 40 P.2d 72 (1935); *Meyer v. State of Nebraska*, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). We believe there is a concomitant right of individuals to a choice of physicians. *See Findlay, supra.* We also realize that in this particular situation the people of Elroy have only one choice of physicians: Dr. Holmes. Unless and until, however, Dr. Holmes provides the hospital and its Board with evidence of good reason why he should not be required to carry professional liability insurance, the courts of this state cannot help him or his patients.

---

6.  573 P.2d 477, 479.

He failed, on appeal, to present any facts that show he is unable to afford the insurance or that insurance is unavailable to him. He is, therefore, apparently being prevented from exercising staff privileges by his own choice.[7]

\* \* \* "

In the case at bar the trial court heard evidence concerning the reasons Hospital adopted the bylaw requiring physicians to obtain professional liability insurance: (1) if both Hospital and a physician were named defendants in a lawsuit, Hospital desired assurance that the physician could contribute toward costs of defending against such an action; (2) Hospital felt it was showing due regard for the patients it serves by requiring insurance coverage for the doctors who might become liable to the patients; (3) by imposing the requirement on the physicians who used Hospital's facilities, Hospital was in a better position to assure insurance coverage for itself, and at a lower premium; and (4) Hospital feared that it might suffer the financial burden for negligence committed in its emergency room by a member of the medical staff if that physician had no insurance.

Dr. Renforth testified that he objected to the insurance requirement solely as a matter of principle. He did not suggest that he could not obtain insurance or that he could not afford to pay the premiums for the insurance.

Although Dr. Renforth presents forceful argument and cites authority in support thereof, we are persuaded to follow the reasoning of the Arizona Supreme Court. Accordingly, we hold that the requirement is substantively valid. Dr. Renforth raises two final procedural issues, however.

Dr. Renforth contends that the amendment to the bylaws was not duly adopted.

Article XVI of the bylaws describes the procedure for amendment: (1) the proposed amendment is submitted at a meeting of the medical staff; (2) the medical staff refers the proposed amendment to a special committee; (3) the special committee reports at the

---

7. 573 P.2d 477, 479-80.

next meeting of the medical staff; (4) adoption requires a two-thirds vote of the active medical staff present; and (5) amendments are effective when approved by the Board of Trustees.

The minutes of the meeting held February 18, 1975, by the medical staff show that the medical staff considered a letter received from the Indiana State Medical Association and the Indiana Hospital Association "urging that our bylaws be changed" to require evidence of medical malpractice insurance before appointment or reappointment to the staff. The medical staff referred the letter to the bylaws committee. The bylaws committee reported back to the medical staff with a recommendation that each physician be left to make his own decision as to whether or not he would acquire insurance.

The minutes of the meeting held by the medical staff on April 22, 1975, include the following entry:

> "A motion was made by Dr. Mazdai and seconded by Dr. Rosen that an addition be made to the medical staff bylaws that every staff member must show evidence of a minimum of $100,000 medical malpractice insurance when seeking appointment and continued reappointment to the medical staff of Fayette Memorial Hospital.
>
> MOTION CARRIED, 8 in favor, 4 against. This will be added to the bylaws."

Mr. Bottorff testified that on May 27, 1975, the Board of Trustees affirmed the Executive Committee's approval of the amendment to the bylaws.

The prescribed procedure does not demand a favorable report from the special committee. We find sufficient compliance with Article XVI.

Dr. Renforth insists that the amendment did not receive adequate votes at the meeting of the medical staff. The minutes show that the motion carried, "8 in favor, 4 against." The minutes also list sixteen voting members as present at the meeting. The bylaws require that proposed amendments must receive a two-thirds vote of the members present.

Mrs. Weisheit, who recorded all of the minutes of the meetings, testified that she always listed as present all those persons who were present at some time during the meeting, regardless of their time of

arrival, time of departure, and duration of stay. She stated that doctors were frequently called from the meetings; some did return and some did not return. Other doctors arrived late for meetings. She could not recall whether anyone abstained from voting at the time of the vote on the insurance amendment. Other persons testified similarly concerning the doctors' arriving and departing as meetings progressed.

Dr. Renforth testified that some doctors did abstain from voting and that he did realize immediately that the number of votes was not sufficient for amending the bylaws. The trial court also heard evidence, however, that Dr. Renforth made absolutely no protest when it was announced that the amendment had been adopted. The minutes of the next meeting of the medical staff show that Dr. Renforth was present and the minutes of the prior meeting were approved as read.

This court must look to the evidence which supports the judgment of the trial court. We cannot say, as a matter of law, that the trial court erred when it found that the amendment was duly adopted by the medical staff.

Lastly, Dr. Renforth contends that he was not provided hearings, as required by the bylaws.

The record reveals that Dr. Renforth was granted hearings and opportunities to make his position known. Furthermore, Article VIII of the bylaws provides that failure to request a hearing shall be deemed waiver of any right to a hearing. Dr. Renforth has not directed our attention to any evidence that he ever requested any hearing which was not provided. Although Dr. Renforth alleges that his termination was not accomplished with precise compliance with prescribed procedure, that is an issue which Dr. Renforth should have raised by seeking a hearing when he.received his notice of termination.

Because Dr. Renforth has failed to show that the trial court committed reversible error, we affirm the judgment entered by the Union Circuit Court.

Lybrook, P.J. and Robertson, J. concur.

NOTE—Reported at 383 N.E.2d 368.