[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] OPINION
This appeal is brought by defendant-appellant Audrey Houser from a judgment of the Court of Common Pleas of Mercer County, Domestic Relations Division, granting custody of her son, Cody to the paternal grandparents.
On January 23, 1995, Audrey gave birth to Cody. Audrey and Tony Houser, Cody's father, were married on March 8, 1995. During the marriage Audrey and Tony resided first with her parents and then with his. In May of 1996, Audrey separated from Tony and took Cody with her. Tony filed for divorce on June 20, 1996. The parties agreed to the resolution of all issues in the divorce except for the parental rights and responsibilities. On November 26, 1997, a hearing was held to resolve those issues. Both parties testified that they would like to be the residential parent and that they would not interfere with the visitation rights of the other. On December 16, 1997, the magistrate filed his report recommending that the paternal grandparents be joined as parties to the case and be granted custody of Cody. Audrey filed her objections and requested findings of fact and conclusions of law on December 24, 1997. On February 11, 1998, the magistrate filed his findings of fact and conclusions of law. The trial court overruled Audrey's objections and adopted the magistrate's report on March 6, 1998.
Audrey claims the following assignments of error.
 The common pleas court erred in reaching and approving the findings of fact and conclusions of law filed February 11, 1998, and approved March 6, 1998.
 The common pleas court committed an abuse of discretion in designating the paternal grandparents legal custodians of the minor child.
 The common pleas court violated Audrey's fundamental right under the United States Constitution and Audrey's right to equal protection under the law by designating the paternal grandparents legal custodians of the minor child without finding Audrey was an unfit or otherwise unsuitable parent.
Appellate Rule 18(C) states in pertinent part:
 If an appellee fails to file his brief within the time provided by this rule, or within the time as extended, he will not be heard at oral argument . . . and in determining the appeal, the court may accept the appellant's statement of the facts and issues as correct and reverse the judgment if appellant's brief reasonably appears to sustain such action.
Here, neither Tony nor the paternal grandparents, who were joined as parties to the action by the trial court sua sponte in its final decree, filed a brief in response to Audrey's. We are accepting Audrey's statement of facts and issues as correct pursuant to App. R. 18(C). Upon a reading of the brief and the record, Audrey's argument reasonably supports a reversal. Thus, we do not address the individual assignments of error. The judgment of the trial court is reversed for the following reasons.
R.C. 3109.04(D)(2) provides:
 If the court finds, with respect to any child under eighteen years of age, that it is in the best interest of the child for neither parent to be designated the residential parent and legal custodian of the child, it may commit the child to a relative of the child or certify a copy of its findings, together with as much of the record and the further information, in narrative form or otherwise, that it considers necessary or as the juvenile court request, to the juvenile court for further proceedings, and upon the certification, the juvenile court has exclusive jurisdiction.
The procedure required to grant custody to a nonparent rather than a parent has been addressed by the Ohio Supreme Court in Inre Perales.
 In an R.C. 2151.23(A)(2) child custody proceeding between a parent and a nonparent, the hearing officer may not award custody to the nonparent without first making a finding of parental unsuitability — that is, without first determining that a preponderance of the evidence shows that the parent abandoned the child, that the parent contractually relinquished custody of the child, that the parent has become totally incapable of supporting or caring for the child, or that an award of custody to the parent would be detrimental to the child.
 In re Perales (1977), 52 Ohio St.2d 89, 369 N.E.2d 1047. AlthoughPerales was a proceeding under R.C. 2151.23, the reasoning has been applied to disputes arising under R.C. 3109.04. In re Dunn
(1992), 79 Ohio App.3d 268, 607 N.E.2d 81 and In re Zeedyk (Nov. 30, 1988), Defiance App. No. 4-87-5, unreported.
 A pure "best interests" test looks totally to the best situation available to the child and places him there. The Perales test, however, requires that some detriment to the child be shown before he is taken away from an otherwise suitable parent. This is based on the assumption that it is in the best interests of the child to live with his parent(s). The court seems to recognize that it is very dangerous for the judiciary to weigh and compare various living situations to determine which might be "best" for a child. Rather the court should not interfere with a parent-child relationship unless some detriment to the child is shown. Thus, by the Perales test, the best interests of the child are served by maintaining the family structure as much as possible. The "natural" right in a parent to raise his or her child is also protected. (See Meyer v. Nebraska (1923), 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042, where the United States Supreme Court construed the Fourteenth Amendment as giving due process protection to parental rights.) But if granting custody to the parent is detrimental to the child, the court is still free to grant custody to a non-parent.
 The Supreme Court has not disturbed its decision in Perales and, therefore, the state of the law in Ohio is that suitable parents have a paramount right to custody of their children so long as such custody is not detrimental to the child.
 Thrasher v. Thrasher (1981), 3 Ohio App.3d 210, 214,444 N.E.2d 431, 434-35.
This court followed this reasoning in Dunn, when we ruled that before custody of a child can be granted to a non-parent rather than a parent, the suitability of the parents must first be determined. The "courts must measure suitability in terms of the harmful effect on the child, not in terms of society's judgment of the parent." In re Dunn, supra (citing to Perales, supra.).
In this case, the trial court did not determine the suitability of the parents before granting custody to the paternal grandparents. In support of its ruling, the trial court adopted the findings of fact and conclusions of law of the magistrate. However, these findings of fact are not supported by a preponderance of the evidence in the record. Indeed, many of the findings are contrary to the uncontroverted evidence before the trial court.
First, the trial court found that Cody had resided with the paternal grandparents since his birth and that they were the primary care givers. The testimony of all the witnesses was that Audrey and Tony were married two months after Cody's birth and then resided with the maternal grandparents for a couple of months. Audrey, Tony, and Cody moved into the paternal grandparents' home in May 1995. They resided in the home until May 1996, when Audrey left and took Cody with her. While the family resided with the paternal grandparents, the uncontroverted testimony was that everyone helped raise Cody. The grandparents testified that they helped with Cody but that Audrey and Tony took responsibility for him as well. After Audrey and Cody moved out, Tony continued to reside with the paternal grandparents. Tony stated that he had liberal visitation with Cody and that his parents helped him with Cody when he was at their home. However, there was no testimony that the paternal grandparents provided all day-to-day care or that Cody would have resided with them had not his parents.
Second, the trial court found that no testimony was presented showing the attitude of the parents towards honoring and facilitating visitation and companionship rights. This finding is directly contrary to the evidence presented.
Tony testified as follows:
 Q (by Mr. Moul): Okay. And what is Audrey's attitude or her comments when she either brings Cody or when you pick Cody up?
 A (by Tony): She's usually nice, you know. But sometimes she don't tell me what she's doing, or she might just ask me if he wants to stay, want me to keep him for a while. Or sometimes she has to work and stuff like that.
Q: Does she willingly give him to you?
A: Yes.
* * *
 Q: Have you and Audrey had much trouble in respect to agreeing where Cody will be between the two of you?
 A: Yeah. Sometimes we'll talk about it, and we'll kind of come to an understanding; and then either her or I will change our mind, and then we'll have to start all over and talk about it again. It's been a hard time.
 Q: Well how long do these periods of agreement typically last?
 A: It varies. Sometimes, you know, we might agree on something for a week or a month. It will change the next day.
 Q: What typically causes a reason that one party wants to change?
 A: I don't know. Just a change of mind, I guess. I don't know what causes it.
 Q: On the whole, would you characterize your ability to get along with Audrey as good, fair, or poor, I mean, in respect to Cody?
 A: We've been getting along pretty good here lately, talking about stuff instead of arguing, fighting.
 Q: Okay. Do you feel if some sort of shared parenting arrangement were made an order, that the two of you could work together to make it work?
A: Oh, I'm sure we could.
* * *
 Q (by Ms. Bashore): Do you provide the transportation to pick up Cody?
 A: I usually go over and get him, and here lately she's been bringing him over and sometimes picking him up too.
* * *
 Q: Has there ever been a time where Audrey has not allowed you contact with Cody?
A: No.
 Q: So there's never been too much of a disagreement on those issues?
A: No.
Transcript 18-22. Audrey gave the following testimony.
 Q (by Ms. Bashore): Okay. Has there ever been a time that you have denied Tony contact with Cody?
A (By Audrey): No.
 Q: In your opinion, why has Cody spent a lot of time in his father's home?
 A: Because I just, I didn't feel right about taking him to a baby-sitter. I figure if he has to be away from me that he should be with his family, and it gives them time to spend with him, too, because I know they love him just as much as I do.
* * *
 Q: Do you have any intention of keeping Cody away from his father?
A: No I don't.
Transcript 51-56. The above testimony was the only evidence presented about the parents' willingness to honor visitation. All the witnesses stated that there were no problems with visitation and neither party had ever tried to interfere with the other's contact with Cody. Thus, the trial court's finding that no evidence was presented concerning the parties attitude toward visitation is not supported by the evidence.
The trial court also found that no child support was paid by either parent. This finding is not supported by the record. The record indicates that Tony was to pay approximately $40 per week in child support. When Tony was out of work he failed to maintain his payments and action was taken by Mercer County Child Support Enforcement. However, Audrey testified that she received child support through the agency and that Tony was paying $60 per week to make up the arrearances. This testimony contradicts the trial court's findings.
The trial court's ninth finding of fact was that the evidence failed to establish if either party intended to reside outside the State of Ohio. This issue was not raised during the hearing because both parties were living with their families in the area and both were employed by local businesses. The fact that neither of them stated they did not intend to move is irrelevant. The parents are not required to state everything that they do not intend to do in order to be suitable parents.
The ninth finding of fact also states that Audrey and Tony are reliant upon their respective families for the basic necessities of life. However, Audrey and Tony both testified that they are employed full time, but that they chose to live with their families in order to reduce their cost of living and to avoid having to resort to public assistance. This is not the same as being reliant upon their parents. The mere fact that they are choosing to reside with their parents for economic benefit does not necessarily work to the detriment of the child. In fact, if it were detrimental for the child to live in an extended family situation, the trial court's decision to grant custody to the paternal grandparents is illogical since that is where the father is residing and the child is still in the same situation.
Finally, the trial court found that the parents did not prove that they were fit to raise the child. However, this finding places the burden on the wrong party. The parents are presumed to be suited to raise their own child. Perales, supra. The trial court can only deny a parent custody of a child and grant custody to a third party if a preponderance of the evidence shows the parents to be unsuitable. Id. Here, the trial court has not found the parents unsuitable. Instead, the trial court determined that the best interest of the child would be served by joining the paternal grandparents sua sponte and giving them custody of Cody. In support, the trial court merely stated that the evidence shows that neither parent should have custody. However, the trial court does not point to any evidence in support of its conclusion.
Another problem with the trial court's actions is the lack of notice to the parents that they could lose the parental rights to a nonparent.
 The rights to conceive and to raise one's children have been deemed "essential," "basic civil rights of man," and "[r]ights far more precious * * * than property rights." "It is cardinal with us that the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for objections the state can neither supply nor hinder."
 Stanley v. Illinois (1972), 405 U.S. 645, 651, 92 S.Ct. 1208,1212-13, 31 L.Ed.2d 551, 558-59. These rights are protected by the Due Process Clause of the Fourteenth Amendment and the Equal Protection Clause of the Ninth and Fourteenth Amendments. Id. The right of parents to raise their children coupled with the right of children to be raised by their parents may not be interfered with unless the parent is unfit. Quilloin v. Walcott (1978)434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511. "We have little doubt that the Due Process Clause would be offended `if a State were to attempt to force the breakup of a natural family over the objections of the parents and their children, without some showing of unfitness and for the sole reason that to do so was thought to be in the children's best interest.'" Id. at 255, 98 S.Ct. at 555,54 L.Ed.2d at 520. This implies that parents at risk of losing their child to a nonparent must be granted notice and opportunity to be heard under the requirements of the Due Process Clause.
Here, the trial court reached its decision after the hearing any notice to the parties of the decision it was considering and without any opportunity for the parents to show why it would be in the child's best interests to be in the care of one of his parents rather than the grandparents. The trial court's actions are not supported by the record. Therefore, the trial court arbitrarily reached its decision.
The judgment of the Court of Common Pleas of Mercer County, Domestic Relations Division, is reversed and remanded for further proceedings in accordance with this opinion.
Judgment reversed and remanded.
HADLEY and EVANS, JJ., concur.