# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs January 10, 2001

## STATE OF TENNESSEE, DEPARTMENT OF CHILDREN'S SERVICES v. T.M.L.

**Appeal from the Juvenile Court for Davidson County**
**No. 9519-18383      Betty Adams Green, Judge**

---

**No. M2000-01785-COA-R3-JV - Filed April 26, 2001**

---

The juvenile court granted a petition to terminate parental rights to three of the children of a Nashville woman. On appeal, the mother challenges the termination in regard to her oldest child only, on the ground that it is not in the child's best interest to be permanently separated from her. We affirm the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed and Remanded**

BEN H. CANTRELL, P.J., M.S., delivered the opinion of the court, in which WILLIAM C. KOCH, JR. and WILLIAM B. CAIN, JJ., joined.

Thomas H. Miller, Franklin, Tennessee, for the appellant T.M.L.

Paul G. Summers, Attorney General and Reporter, Douglas Earl Dimond, Assistant Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.
### A MOTHER AND HER CHILDREN

T.M.L. is the mother of eight children, all born out of wedlock to at least four different fathers. The subject of this appeal is L.D.L., Ms. L.'s daughter and oldest child, who was born on July 9, 1987. When the mother found that she was unable to take care of the needs of her younger

children, she relied heavily upon the assistance of L.D.L., as well as upon numerous services provided over the years by the Department of Children's Services.[1]

On July 3, 1995, the Department filed a petition for temporary custody and emergency removal of the six children that were in Ms. L.'s custody at the time, on the ground that the children were dependent and neglected. The petition stated that Ms. L. and her children had been staying in a large and livable home with distant relatives, but that for reasons of her own, Ms. L. had decided to leave the home with her children, even though she had no place to go.

The court entered an emergency protective order placing the children in the temporary care and custody of the Department. A preliminary hearing was conducted on July 10. Ms. L. was present at the hearing, as was the Guardian ad Litem for the children, Ms. L.'s attorney, four social workers from the Department of Human Services, the Department's attorney, Ms. L.'s mother, both the paternal grandmother and the aunt of Ms. L.'s oldest son, M.L., Ms. L.'s godmother, and the relatives Ms. L. had been staying with before the petition was filed.

The court found that the Department had acted appropriately in removing the children, because the lack of housing posed an immediate threat to their health and safety. However, the court also found that in the interim Ms. L. had secured housing, and since she felt that she was capable of handling two of her children, it returned custody of K.L. and R.L. to her, with custody of the remaining children to remain with the Department pending a final hearing. In addition, the court ordered the Department to arrange for a home interventionist to work with Ms. L., for a psychological exam to be conducted on her, and that she become involved in the Regional Intervention Program (RIP).

On October 26, 1995, the court conducted a trial on the petition for custody. Many of the same people who had attended the preliminary hearing were present, as well as foster parents for three of the children, and the children's pediatrician. The court found the youngest child (who was less than a year old at the time) to be neglected due to loss of weight and a period of untreated illness, but stated that "this neglect is due to a lack of knowledge and poor judgment on the part of the mother rather than any attempt to harm him." The court also found the other five children to be either dependent or dependent and neglected, but returned legal custody of L.D.L. to Ms. L. The Department was ordered to provide additional assistance to Ms. L., including the creation of a Plan of Care. A detailed Plan of Care, signed by Ms. L., is contained in the record.

During the next two years, the Department worked with the family, and gradually returned the children to Ms. L. However, she was still unable to take care of them. She placed her two youngest children with a family friend, two others with their father, and another with a foster mother, placements that were all confirmed by custody orders.

---

[1]The facts of this case occurred both before and after the Department of Children's Services was split off from the Department of Human Services. For convenience and simplicity we will refer to both as "the Department."

By August of 1998, Ms. L. was living in the home of her aunt with three of her children, L.D.L., M.L., and R.L., her next oldest son. With the agreement of the Department, she filed a petition on August 3, 1998, to be relieved of custody of all three children, stating that she no longer could control them, and that her aunt could no longer house all of them. The petition listed Ms. L. as homeless and unemployed. The court granted Ms. L.'s petition, finding that the children were neglected and dependent, and since no one was willing to assume legal responsibility for them, their custody was transferred to the State.

## II.
### TERMINATION PROCEEDINGS BEGIN

On July 12, 1999, the Department filed a petition to terminate parental rights to L.D.L., M.L., and R.L. In addition to Ms. L., the petition named four men who Ms. L. said were or could be the father of these children. The two men who Ms. L. named as possible fathers to L.D.L. could not be found after a diligent search, and had to be served by publication. One of those men was also named as a possible father to R.L. The other man named as a possible father to R.L. admitted that he had fathered two other children by Ms. L., and in fact he had custody of those children and supported them. But he never admitted paternity of R.L., and he signed a waiver of interest as to that child.

E.C. was named by Ms. L as the father of M.L. In order to testify at the termination hearing, he had to be transported from prison, where he was serving a ten year sentence for aggravated burglary. E.C. acknowledged M.L. as his son, and expressed a desire for custody. Blood tests had been taken on E.C. and M.L. to establish paternity, but the results of M.L.'s test had not yet been returned. E.C. admitted that he had no contact with the child after 1995.

The trial began on February 29, 2000. Ms. L. testified that she was pregnant by a new man she was living with. She said that the two of them had been living in a motel for two weeks, but she had been homeless for almost two years before that. She also testified that she had never been employed, but that she was capable of working, and not disabled.

Ms. L. stated that she was not contesting the termination petition as to M.L. and R.L., because they both had been diagnosed with Attention Deficit Hyperactivity Disorder (ADHD), and were very hard for her to deal with. By this time, the two boys were living in therapeutic group homes, and Ms. L. had very little contact with them.

The mother did not agree, however, that her rights to her oldest daughter should be terminated, because she believed that the twelve-year old did not have any behavior problems that would prevent Ms. L. from parenting her child effectively. L.D.L. had been placed in a group home at the Tennessee Preparatory School (TPS), and Ms. L. testified that for the past month, she and her daughter had talked on the telephone every night for about thirty minutes each time. Two social workers who were familiar with them testified that Ms. L. and her daughter were on friendly terms, but that their connection was more like a friendship between peers than like a mother-daughter relationship.

The evidence also showed that Ms. L. had only visited L.D.L. once in the four months before the Petition to Terminate Parental Rights was filed, and only once between the filing of the petition and the hearing, even though the Plan of Care included a provision for regular visitation. She also failed to comply with the other responsibilities established by the Plan of Care, including the use of birth control, the completion of counseling for a panic disorder, obtaining a referral to a weight loss clinic, and earning money to get her own apartment.

Ms. L. complained that her social worker had given up on her, but she admitted that she had received numerous services from the Department over the years including payment of rent, provision of food orders, cleaning supplies, nonprescription drugs, diapers, bedding, furniture, a washer and dryer, bus passes, and homemaker and cleaning services.

At the end of a full day of testimony, the trial judge declared that she would take the case under advisement, pending the results of the paternity testing on M.L., and that if the test proved that E.C. was the father, he would be given the opportunity to present other evidence in opposition to termination of his parental rights. If the tests proved otherwise, then the judge would hear closing arguments and issue her ruling.

### III.
#### THE TERMINATION HEARING CONTINUES

The hearing recommenced on June 5, 2000. Ms. L. was the only witness to testify, but closing arguments were made on behalf of all the interested parties. Although E.C.'s attorney did not present any further proof, he argued that his client's parental rights should not be terminated because he was not included in the Plan of Care, and was never offered any of the services that the Department provided to Ms. L.

Ms. L. testified that the due date for her pregnancy was July 31. She was no longer living with the father of her child, who had relapsed into crack cocaine addiction. She was still "seeing him," however, and had refused to enter a four week counseling program because one of the stipulations of the program was that she not see him for a month.

Ms. L. was staying at the Family Life Center, and waiting for the Metro Housing Authority to provide her with an apartment. She had enrolled in a different counseling program (although so far she had only attended two of the four sessions that had been scheduled for her) and was attending a four week program sponsored by the Department, called the Fresh Start Program. She said that she planned to get her GED and job training.

Ms. L. said that she still talked on the phone with L.D.L. every night. However, the proof showed that between February 5, 2000 and June 5, 2000, Ms. L. had visited her daughter only twice, and that on one of those occasions the child had been brought to her.

At the conclusion of the closing arguments, the trial court ruled that the Department had proven the grounds for termination of parental rights by clear and convincing evidence, specifically,

the grounds stated in Tenn. Code. Ann. § 36-113-(g)(3)(A). The judge stated that she believed that Ms. L. loved her children, but that she did not express her love by assuming the responsibilities of parenthood, and therefore that such termination was in the best interest of all the children. In its Final Decree of Guardianship, the court terminated the parental rights of Ms. L. and of four named and any unknown fathers of L.D.L., M.L. and R.L. Ms. L. has appealed the judge's ruling in regard to L.D.L. only. E.C. did not appeal the termination of his parental rights.

## IV.
### THE QUESTION OF BEST INTERESTS

The rights of parents to the custody and upbringing of their own children is a fundamental liberty that is protected by both the United States and Tennessee Constitutions. *In Re Swanson*, 2 S.W.3d 180 (Tenn. 1999); *Stanley v. Illinois*, 405 U.S. 645 (1972); *Meyer v. Nebraska*, 262 U.S. 390 (1923). Yet a parent's rights are not absolute, but may be terminated on statutory grounds such as abandonment or abuse, when required to protect the best interests of the children.

Tenn. Code. Ann. § 36-1-113 governs the termination of parental rights in Tennessee. Under Section (c) of the statute, termination of parental or guardianship rights must be based upon:

(1) A finding by the court by clear and convincing evidence that the grounds for termination or parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

Section (g) of the same statute states that termination of parental or guardianship rights may be based upon any of the following grounds:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan or a plan of care pursuant to the provisions of title 37, chapter 2, part 4;

(3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

The appellant does not dispute that the grounds for termination of her parental rights have been established by clear and convincing evidence. Her sole argument on appeal is that there was scant evidence that it would be in the best interest of L.D.L. to have the relationship with her mother terminated.

The appellant infers that her nightly telephone conversations with her daughter provide evidence of a valuable relationship between them, and argues that there was no proof that eventual reunification between the mother and daughter would be detrimental to L.D.L.

It appears to us, however, that the trial court was correct in finding that Ms. L. had proven herself incapable of providing the structure that the best interest of a child or teenager requires, and that continuation of the parental relationship would likely interfere with the possibility of establishing or maintaining an alternative structure for L.D.L.'s benefit.

The trial court noted that L.D.L. had been in the custody of the Department for a period of over two years prior to the entry of the Final Decree of Guardianship, and that the Department made heroic efforts to help Ms. L. acquire the skills and knowledge that would enable her to be reunited with her children. Despite those efforts, Ms. L. has made virtually no progress towards the goals stated in her Plan of Care. The record reveals that while Ms. L. was perfectly willing to accept the material help offered by the Department, she simply refused to make any effort of her own to improve her situation or that of her children.

We would further note that Ms. L.'s continuing relationship with the father of her unborn child makes any reunification with L.D.L. problematic at the very least. During the hearing of February 29, Ms. L. was asked how she was going to take care of the child that she was carrying. She replied that "the father's going to help take care of us." She also testified that the father had been convicted of assaulting her when she was three weeks pregnant, and that he was addicted to crack cocaine. She did not testify as to any willingness on his part to care for L.D.L. We must thus conclude that contrary to appellant's argument, the record shows by clear and convincing evidence that it would be in the child's best interest to terminate the parental rights of Ms. L. As long as the parent-child relationship continues, L.D.L. has little chance of becoming part of a safe, stable, and permanent home. We affirm the trial court.

## V.

The decree of the trial court is affirmed.  Remand this cause to the Juvenile Court of Davidson County for further proceedings consistent with this opinion.  Tax the costs on appeal to the appellant, T.M.L.

_____
BEN H. CANTRELL, PRESIDING JUDGE, M.S.