DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
 {¶ 1} Appellant, Dale W. ("Father"), has appealed from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated his parental rights to his children, M.W. and D.R., and placed them in the permanent custody of Summit County Children Services Board ("CSB"). This Court reverses.
 I *Page 2 {¶ 2} Father has two children, M.W., born October 13, 2000, and D.R., born October 15, 2002. The mother of the children was found to have abandoned them and is not a party to the present appeal.
 {¶ 3} Upon allegations of dependency and neglect, the children were taken into custody on March 29, 2005, when Father was arrested for drug offenses. In February 2006, Father entered a plea of guilty to attempted drug trafficking in marijuana, a first degree misdemeanor. He was sentenced on that charge and a later incurred charge of domestic violence, a felony of the fourth degree. He received a suspended sentence of six months on each charge, to be served concurrently. In addition, he was ordered to complete an anger management program and to serve 60 days in Oriana House with work release.
 {¶ 4} The matter proceeded to adjudication and disposition, where the children were adjudicated neglected and dependent and were placed in the temporary custody of the agency. At the time of disposition, the trial court adopted a case plan which required Father to: (1) complete a drug and alcohol assessment and follow all recommendations, including random drug screens; (2) comply with the terms of his probation, including finding employment; and (3) take a parenting course and implement what he learned. One year later, the trial court ordered CSB to amend the case plan to require that Father obtain "adequate housing." Consequently, in August 2006, the case plan was amended to require Father to find "stable suitable housing" and to complete a parenting assessment. *Page 3 
 {¶ 5} Two six-month extensions were granted in order to give Father additional time to complete his case plan. On January 22, 2007, CSB moved for permanent custody. Following a hearing, the trial court granted CSB's motion and placed the children in the permanent custody of CSB. Father's motion for a new trial was denied.
 {¶ 6} Father has timely appealed and has assigned one error for review.
 II Assignment of Error "THE TRIAL COURT ERRED IN FINDING THAT PERMANENT CUSTODY WAS SUPPORTED BY CLEAR AND CONVINCING EVIDENCE AND THE GRANT OF PERMANENT CUSTODY WAS [AGAINST] THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 7} Through his sole assignment of error, Father has contended that the findings made by the trial court to support its order granting permanent custody of the children to CSB are not supported by clear and convincing evidence and that the trial court's grant of permanent custody to CSB is against the manifest weight of the evidence.
 {¶ 8} Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period, or that the child cannot be *Page 4 
placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). See R.C. 2151.414(B)(1) and 2151.414(B)(2); see, also, In re William S.
(1996), 75 Ohio St.3d 95, 99.
 {¶ 9} The trial court found that the first prong of the permanent custody test was satisfied because the children had been in the temporary custody of CSB for at least 12 of the prior 22 months. Father has not contested that finding, but has argued that the trial court erred in finding that permanent custody was in the best interest of the children.
 {¶ 10} When determining whether a grant of permanent custody is in the children's best interest, the juvenile court must consider the following factors:
 "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; [and] *Page 5 
 "(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child." R.C. 2151.414(D)(1)-(5).
Although the trial court is not precluded from considering other relevant factors, the statute explicitly requires the court to consider all of the enumerated factors. See In re Smith (Jan. 2, 2002), 9th Dist. No. 20711, at *3; see, also, In re Palladino, 11th Dist. No. 2002-G-2445, 2002-Ohio-5606, at ¶ 24. Further, the Supreme Court has directed that no one factor is to be given greater weight or heightened significance than another. In re Schaefer, 111 Ohio St.3d 498,2006-Ohio-5513, at ¶ 56.
 {¶ 11} The best interest portion of the permanent custody test requires the agency to prove by clear and convincing evidence that permanent custody is in the best interest of the child. R.C.2151.414(B)(1). Clear and convincing evidence is more than a mere preponderance of evidence. Cross v. Ledford (1954), 161 Ohio St. 469, paragraph three of the syllabus. Instead, it is evidence sufficient to produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established. In re Adoption of Holcomb (1985),18 Ohio St.3d 361, 368; Cross, 161 Ohio St. at paragraph three of the syllabus. An appellate court will not reverse a trial court's termination of parental rights and award of permanent custody to an agency if the judgment is supported by clear and convincing evidence.Holcomb, 18 Ohio St.3d at 368. *Page 6 
 {¶ 12} The first best interest factor requires consideration of the relevant personal interactions and interrelationships of the children. On this point, the trial court found that the children enjoy their visits with Father, that Father is appropriate in his interaction with the children, and that he clearly loves them deeply. In addition, the trial court found that the children are also well bonded with the foster family.
 {¶ 13} In reviewing the additional evidence in the record, we find the following. Amy Thomas, a psychology assistant at Northeast Ohio Behavioral Health, conducted a parenting assessment of Father. She testified that Father was very pleasant, cooperative, and likable, as well as outgoing with adequate self-esteem. She noted that Father sincerely expressed love for his children and gave socially desirable responses with respect to his feelings for them.
 {¶ 14} Thomas testified that Father's full-scale IQ score of 77 would not prevent him from parenting. She also speculated that it might affect his ability to transfer what he learned in his parenting classes to real life situations. It should be noted that Thomas's assessment was conducted before Father engaged in parenting classes and most of his services, and the record offers no evidence to demonstrate support of Thomas's speculation. In fact, the evidence regarding Father's subsequent conduct during visits with his children is to the contrary. The CSB caseworker, Christina Snyder, testified that those who observed Father's visits with his children reported that Father was always appropriate with his *Page 7 
children, demonstrated progress in his interactions with them, was receptive to suggestions, and implemented things he learned in his parenting classes.
 {¶ 15} Snyder also stated that Father had made many improvements during the last year and had learned a great deal from the programs he attended. She explained that Father completed a parenting assessment, completed a parenting course, regularly attended scheduled visits, was always on time for visits, and, in fact, was usually early. She stated that Father typically brought a snack of fruit or sandwiches and a craft or activity for the children. Father also completed a 26-week anger management course, completed a substance abuse program, regularly submitted to weekly or twice-weekly drug tests, as requested, and never had a positive test result.
 {¶ 16} Caseworker Snyder continued by stating that, unlike many parents who work with CSB, Father not only went to programs, but he participated and tried to learn from them, trying to better himself. Snyder specifically noted that Father "has been very willing to do anything that's been offered to him as far as services are concerned. Anything that has been offered that someone thinks could benefit him, he's done." She explained that Father even voluntarily engaged in Project Learn — for twice weekly three-hour sessions — in order to address his reading problems and, as a result, was able to improve one grade level in reading and two grade levels in math. After being in this program, he began reading with *Page 8 
his daughter during visits. Father also completed a job search program sponsored by the Urban League.
 {¶ 17} Psychology assistant Thomas questioned whether Father would be able to anticipate his need for services in the future. Caseworker Snyder testified, however, that mentoring programs would continue to be available to Father and Father expressed his willingness to be a part of a voluntary case plan and utilize programs such as Help Me Grow. He also expressed an interest in taking additional parenting classes in the future because he found such classes helpful.
 {¶ 18} Aimee Harris, the guardian ad litem, confirmed that the children were bonded to Father and were excited and very happy to see him at visitations. They would run to him and hug him when they arrived. She found Father's behavior to be appropriate and also noted that case aides reported that he had made progress in his interaction with the children and was receptive to their parenting suggestions.
 {¶ 19} Father also testified in his own behalf. He stated that he loves his children very much and wants to raise them. He admitted to problems in the past, but because of the programs in which he had participated, he asserted: "I'm not the man I used to be." Father's seventeen-year-old daughter also attended visits occasionally. *Page 9 
 {¶ 20} The reasons cited by the trial court on this factor along with the evidence which bears upon this factor do not clearly and convincingly weigh in favor of termination.
 {¶ 21} On the second best interest factor, the children's wishes, the trial judge found that M.W. indicated during an in camera interview that she wished to remain with her foster family, that D.R. was too young to express a preference, and that the guardian ad litem recommended permanent custody as being in the children's best interest. R.C.2151.414(D)(2) provides that the wishes of the child may be expressed directly by the child or through the child's guardian ad litem, "with due regard for the maturity of the child."
 {¶ 22} As to the direct expression of M.W.'s wishes to the trial judge, there is no transcript of the in camera interview of this child in the record. In the absence of such evidence, we presume regularity. However, we are also obligated to review the additional evidence in the record that is relevant to this point.
 {¶ 23} According to the guardian ad litem, M.W. told case aides that she wanted to live with Father. D.R. told the guardian ad litem that he, too, wanted to return to Father, although the guardian ad litem believed D.R. was happy and comfortable with his foster family. For the reasons that follow, however, we must conclude that any statements by M.W. as to where she would like to live are of doubtful credibility and maturity. *Page 10 
 {¶ 24} Both the caseworker and the guardian ad litem testified that M.W. had a tendency to fabricate stories, and the resulting investigations into some of her allegations established that she did make up stories. The caseworker testified that both the foster mother and the child's counselor confirmed that M.W. "lies a lot." On occasion, M.W. made verbal claims of being injured by both her father and the foster mother. Of concern here, we note that the allegations regarding Father were contradicted by the child's own behavior during visits and investigations by service providers or were objectively disproved by medical records.
 {¶ 25} The guardian ad litem testified that M.W. had once implied that she had a fear of being with Father. The guardian ad litem made a point of attending the next visit to observe the child's interactions with him. The guardian ad litem described the visit in this way: "Excellent visit. Perfect. No fear, no reservations. * * * It was loving, bonding, bonding type visit, so it gave me no evidence of anything other than, you know, the things that she states in the visits as far as, you know, wanting to be with dad and live with dad." The guardian ad litem specifically testified that she never observed either of the two children exhibit fear of Father, but, instead, observed them hug him and freely tell him that they love him.
 {¶ 26} As stated above, R.C. 2151.414(D)(2) provides that the recommendation of the guardian ad litem may be considered in situations where *Page 11 
minor children are not able to offer a mature representation of their own wishes. In this regard, the trial court found that the guardian ad litem recommended that permanent custody is in the best interest of the children. Upon review, however, this Court does not find that the record demonstrates that the guardian ad litem offered an unqualified recommendation of permanent custody at either the hearing or in her written report.
 {¶ 27} When the guardian ad litem was asked for her recommendation as to custody at the permanent custody hearing, she stated that she would like to see some continuing support systems in place for Father "if [the children] were to return home." This position corresponds with evidence that continuing services were available to Father and that Father would willingly accept them. In her written report, the guardian ad litem offered a similarly conditioned response, recommending permanent custody "UNLESS" Father had verifiable housing and employment and supervision could be maintained. (Emphasis in original.) The statement, in context, is as follows:
 "Both [D.R.] and [M.W.] should be placed in the Permanent Custody of CSB UNLESS [Father] has verifiable housing and employment and Protective Supervision of these children can be maintained by CSB to monitor [Father's] ability to sustain employment and housing AND his ability to provide the basic needs for these children, including: shelter, food, educational, physical and mental health services." (Emphasis in original.)
 {¶ 28} Therefore, our review of the reasons upon which the trial court based its decision and of the evidence in the record which bears upon this factor, reveals *Page 12 
that M.W. lacked the maturity and/or credibility to state her own wishes as to custody. Furthermore, the record indicates that the guardian ad litem's recommendation was not an unequivocal endorsement of permanent custody, but, rather, was a very conditional recommendation.
 {¶ 29} The third best interest factor requires consideration of the custodial history of the children. The trial judge indicated that the children lived with both parents initially and then lived with Father until their removal in March 2005. Since that time, the children have spent more than two years with the same foster mother. The foster mother, who has another two-year-old, is reportedly interested in adopting both M.W. and D.R.
 {¶ 30} The period of temporary custody was lengthened by two six-month extensions of time. Those extensions were apparently granted by the trial court because they were judged to be in the best interests of the children and because Father had made significant progress on his case plan. See R.C. 2151.415(D) (governing motions for six-month extensions of temporary custody). See, generally, In re Smith (January 2, 2002), 9th Dist. No. 20711, at *10. Based on those findings, as well as Father's consistent and positive visitation record, this factor does not clearly and convincingly weigh against Father.
 {¶ 31} The fourth factor requires consideration of the children's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency. On this point, the *Page 13 
trial court found that there are no relatives who can provide care for the children and that Father had failed to demonstrate that he can meet his children's needs on a consistent basis. Specifically, the trial judge reasoned that, despite Father's achievements, he only recently obtained housing, was employed by an employer who had failed to pay him in the past, and supplemented his income by doing auto-detailing.
 {¶ 32} In reviewing the rationale of the trial court, we find that the court appeared to give weight to the fact that Father had 27 months to obtain "stability," but that he only recently obtained housing and employment. Although this case had been pending since March 2005, and the original case plan was implemented in June 2005, the requirement for housing was added as an amendment to the case plan in August 2006, 17 months into the case. At the permanent custody hearing, the caseworker testified that Father had been working hard on rehabbing the home, that Father had appropriately furnished it for the two children, and that it was suitable for the family.
 {¶ 33} As to the matter of securing employment, that requirement was included in the case plan only as a term of Father's probation, and Father's probation officer apparently reported that he was compliant with those terms. Moreover, we find no fault with the fact that Father has seen fit to supplement his income by taking a second job or that he returned to a job that he had once quit *Page 14 
because he was not being paid. According to Father, he was being paid at the time of the hearing by that employer and there is no evidence to dispute that.
 {¶ 34} Regarding the larger question of whether a legally secure permanent placement can be achieved in this case without a grant of permanent custody to CSB, there was evidence before the trial court that Father willingly agreed to a gradual transition of the children back to his care, to take additional parenting classes, and to accept mentoring programs, such as Help Me Grow, if the children were returned to him. The guardian ad litem recommended that custody be returned to Father if he demonstrated verifiable housing and employment and if protective supervision could be maintained. The caseworker testified similarly. She believed that Father had complied with most of his case plan and stated that housing remained her only concern. At the time of the permanent custody hearing, the evidence established that Father had housing and was employed. In addition, both parties had agreed to protective supervision of the children.
 {¶ 35} In reviewing the reasoning of the trial court and the evidence presented upon all of the statutory best interest factors, we are not persuaded that there was clear and convincing evidence, i.e., evidence by which the trial court could have formed a firm belief or conviction that granting permanent custody of the children to the agency was in their best interests. According to both the CSB caseworker and the court-appointed guardian ad litem, Father not only completed the bulk of his case plan requirements, but did so with enthusiasm, sincerity, and *Page 15 
consistency. It is seldom that this Court sees a parent who has made such extraordinary efforts to comply with the requests of a children services agency and has even gone beyond what has been required of him. Even the trial judge acknowledged his "tremendous strides." Father's involvement with drugs was the reason for initially removing the children from his home. That concern, by all accounts, has been fully addressed.
 {¶ 36} In reviewing the evidence on the best interest factors, we are reminded that the Supreme Court has directed that no one factor is to be given greater weight or heightened significance than another. In reSchaefer, at ¶ 56. Upon the statutory best interest factors, the record demonstrates that, not only has Father maintained a strong bond and positive relationship with his children, but that despite great odds, Father has turned his life around and devoted himself to his children. The wishes of the children, as expressed by the recommendation of the guardian ad litem, were contingent on Father obtaining housing, employment, and agreeing to protective supervision, matters attained by the time of the permanent custody hearing. Though the period of temporary custody was long, the trial court granted two extensions of temporary custody in this case, and Father's consistent record of visitation was in his favor.
 {¶ 37} The probation officer was satisfied with Father's employment and the caseworker found his housing to be suitable. The fact that Father did not live in the same house or have the same job for a lengthy period of time before the *Page 16 
permanent custody hearing is not sufficient to establish clear and convincing evidence that the children's interests would be best served by being placed in the permanent custody of CSB and permanently separated from their father.
 {¶ 38} The Court has not come to this position easily. We appreciate that this is a difficult decision and that Father's success is not inevitable. Nevertheless, we are compelled to reach our conclusion by the facts of this case and our recognition of the heavy burden placed upon an agency seeking to terminate the "fundamental liberty interest" of a parent in the care, custody, and management of his or her children. See Santosky v. Kramer (1982), 455 U.S. 745, 753. The right to raise one's children has been recognized as an "essential" and "basic civil right[.]." See Stanley v. Illinois (1972), 405 U.S. 645, 651; Meyer v.Nebraska (1923), 262 U.S. 390, 399. Ohio's statutory system of intervention, case planning, and mentoring through services has been designed for the purpose of attempting to preserve families whenever possible. It seems, in this case, to have worked. According to that system, this father should be reunited with his children.
 {¶ 39} Accordingly, we conclude that the judgment of the juvenile court terminating Father's parental rights was not supported by clear and convincing evidence. Father's sole assignment of error is, therefore, sustained.
 III {¶ 40} Father's assignment of error is sustained. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is reversed *Page 17 
Judgment reversed, and cause remanded.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellee.
 MOORE, P. J. SLABY, J. CONCURS *Page 18