# Supreme Court of Texas

No. 24-0307

In the Interest of H.S., B.S., and M.S., Children

On Petition for Review from the
Court of Appeals for the Second District of Texas

JUSTICE LEHRMANN, joined by Justice Bland and Justice Huddle, dissenting in part.

The Court holds that termination of Father's parental rights was in the children's best interest but that termination of Mother's parental rights was not. I agree that Father's parental rights were properly terminated, but I would hold that, under the proper standard of review, legally sufficient evidence also supports the jury's findings as to Mother. Because the Court disregards considerable evidence supporting the jury's verdict and, in doing so, fails to properly defer to the jury's role as factfinder, I must respectfully express my dissent.

## I. Background

In May 2022, Father physically assaulted Mother. During an argument, Father "picked [Mother] up by the throat and slammed [her] on top of his toolbox." As the couple's then-eight-year-old child watched, Father used a hammer to hit himself on the head. Mother was able to

grab the kids and take them first to her mother's house, then to her friend's, and finally to Missouri.

Unfortunately, this event was not an isolated one. Father has a history of abusive, violent, and self-harming behavior in the home. In one instance, Father sped a car towards the family's home while the children were inside; he stopped short of crashing into the home. In three other separate incidents occurring while the children were in the home, he "bashed" his head on a countertop, grabbed a gun and threatened to shoot himself, and threatened to shoot himself with a nail gun. Twice he attempted to hang himself—once in the couple's bedroom and once in the front yard.

After the May 2022 incident, Mother's friend took her to file a police report. That report prompted a Department investigation. Later, Mother returned from Missouri with the children and met with a Department investigator. Mother told the investigator that she believed Father would eventually kill her; accordingly, she did not intend to reunite with him. The Department assigned a Family-Based Safety Services specialist and established a safety plan, which did not allow Father to have unsupervised contact with the children. The specialist discussed the safety plan with Mother and informed her that if she violated it, the Department could seek to remove the children for their safety. Mother agreed to the plan.

The next time the specialist attempted to schedule a visit, Mother refused, insisting that the Department obtain a warrant to see the children. Concerned about the children's well-being, the Department requested a welfare check. During that check, a police officer discovered

that Father was back in the home, unsupervised, with the children. As Mother had violated the safety plan, the children were removed from the home.

Following removal, the Department worked with Mother and Father to assign service plans. Among other requirements, the service plans required both parents to maintain housing and transportation, attend scheduled visits with the children, submit to random drug testing, and participate in counseling. By the time of trial, neither parent had completed their service plan. They refused drug testing multiple times; when Mother did complete a drug test, she tested positive for heroin, methamphetamine, amphetamines, and opiates.

The parents' completion of their visitation requirements was likewise problematic. According to the children's attorney ad litem, Mother was confrontational from the first visit, interrogating the children to the point that "multiple people intervened . . . and tried to redirect." Eventually, the children's therapist and attorney ad litem requested suspension of visitation after law enforcement had to intercede to "get [the parents] to leave." Reportedly, Mother began saying "derogatory terms" to the Department caseworkers in front of her son, Henry. As a result, Henry became upset, and Mother and Father "barricaded him" between themselves. The parents then began blaming the Department for not allowing him to go home. After forty-five minutes, the caseworkers called law enforcement. At that point, Mother stated that she would not let Henry go—the police officer would have to "yank him off of her." After the police arrived, it took another hour to calm Henry down and end the visit. This incident led the attorney ad

3

litem to move to suspend visitation "until such time that more trauma is not being caused," and the trial court granted that motion.

The case proceeded to trial, during which both Father and Mother admitted that they had endangered their children due to the violence in their home. The jury found that the Department proved by clear and convincing evidence that Mother and Father had engaged in conduct satisfying three predicate grounds for termination and that termination was in the children's best interest. The trial court rendered judgment accordingly, and the court of appeals affirmed.

## II. Standard of Review in Parental Termination Cases

As the Court correctly highlights, the State must meet a clear-and-convincing burden of proof at trial to terminate parental rights. *In re J.W.*, 645 S.W.3d 726, 741 (Tex. 2022); TEX. FAM. CODE § 161.001(b). That heightened burden requires us "to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). In making that determination, "we 'look at all the evidence in the light most favorable to the finding,' 'assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so,' and 'disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible.'" *J.W.*, 645 S.W.3d at 741 (quoting *J.F.C.*, 96 S.W.3d at 266). But "we may not disregard 'undisputed facts that do not support the finding.'" *Id.* (quoting *J.F.C.*, 96 S.W.3d at 266).

I wholeheartedly agree with the Court that the Legislature's imposition of a clear-and-convincing burden, and the corresponding

4

heightened standard of appellate review, reflects the constitutional magnitude of the rights at stake. *Ante* at 18.[1]  However, we must also keep in mind "the required appellate deference to the factfinder." *J.W.*,

---

[1] The Court provides some helpful historical context for the termination of parental rights in the United States. *See ante* at 19–20.  I would add that the state's authority to intervene in the parent–child relationship began to develop alongside the notion that children are not the "property" of their parents and may not be treated as such.  Vanessa L. Warzynski, *Termination of Parental Rights: The Psychological Parent Standard*, 39 VILL. L. REV. 737, 741–43 (1994).  To be sure, parental rights are rightly recognized as, among other things, "essential," *Stanley v. Illinois*, 405 U.S. 645, 651 (1972) (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399 (1923)), "precious," *id.* (quoting *May v. Anderson*, 345 U.S. 528, 533 (1953)), and "fundamental," *In re G.M.*, 596 S.W.2d 846, 846 (Tex. 1980).  But they are not absolute.  *See, e.g.*, *Stanley*, 405 U.S. at 653 ("We do not question the assertion that neglectful parents may be separated from their children.").  In 1997, to address the concern that courts were interpreting federal legislation "as a directive to keep biological families together at all costs," Congress passed the Adoption and Safe Families Act (ASFA), which moved "away from a presumption that everything should be done to reunite children with their birth parents, even if the parents have been abusive."  Katharine Q. Seelye, *Clinton to Approve Sweeping Shift in Adoption*, N.Y. TIMES, Nov. 17, 1997, at A20.  That presumption had contributed to the growing number of children languishing in the foster care system.  *Id.*; *see also* Abigail Rose Drumm, *Understanding the Adoption and Safe Families Act (ASFA): History and Impacts*, Adoption Advocate, NAT'L COUNCIL FOR ADOPTION (Oct. 5, 2023), https://adoptioncouncil.org/publications/understanding-the-adoption-and-safe-families-act-asfa/ (last visited June 3, 2026) ("Based on . . . existing research, the [ASFA] has achieved the goals of reducing timeframes for youth in foster care and increasing the rate of adoption.").  More recently, Congress enacted the Family First Prevention Services Act in 2018 to authorize states to use federal funding not only for foster care but also for services to keep families together and prevent children from entering the foster care system in the first instance.  *How the Family First Prevention Services Act Supports Maternal Mental Health and Substance Use Recovery*, POL'Y CENTER FOR MATERNAL MENTAL HEALTH (July 24, 2025), https://policycentermmh.org/family-first-prevention-services-act-supports-maternal-mental-health-and-substance-use-recovery/ (last visited June 3, 2026).

645 S.W.3d at 741. Even under the heightened standard, "the factfinder remains 'the sole arbiter of the witnesses' credibility and demeanor.'" *Id.* (quoting *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021)). Deference is required, and rightly so, because it is the factfinder, not the appellate court, "who heard the witnesses and evaluated their credibility." *J.F.-G.*, 627 S.W.3d at 311–12. This standard "honor[s] not only the elevated burden of proof, but also the deference an appellate court must have for the factfinder's role." *In re A.C.*, 560 S.W.3d 624, 630 (Tex. 2018); *see also In re Commitment of Stoddard*, 619 S.W.3d 665, 674–75 (Tex. 2020) (recognizing the importance of deference even when the burden of proof is beyond a reasonable doubt).

### III. Analysis

Parental rights may be terminated only if a court "finds by clear and convincing evidence both that (1) the parent committed an act prohibited under Texas Family Code Section 161.001(b)(1), and (2) termination is in the child's best interest." *J.W.*, 654 S.W.3d at 741; TEX. FAM. CODE § 161.001(b). I first address why sufficient evidence supports the predicate grounds before turning to the best-interest finding.

### A. Predicate Grounds

Mother challenges the sufficiency of the evidence for the predicate grounds involving endangerment of the child:

> (D) [the parent has] knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child;

6

(E) [the parent has] engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child[.]

TEX. FAM. CODE § 161.001(b)(1)(D)–(E). "'[E]ndanger' means 'to expose to loss or injury; to jeopardize,'" and "[a]lthough 'endanger means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment,' it does not require that there be conduct 'directed at the child' or that 'the child actually suffer[] injury.'" *J.W.*, 645 S.W.3d at 748 (quoting *Tex. Dep't of Hum. Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987)). Subsections (D) and (E) focus on the child's environment before removal. *Id.* at 749.

The conduct of a parent or other person in the home is relevant to the endangerment inquiry. *Id.* One parent's knowledge of the other parent's creation of a dangerous environment, along with a "corresponding failure to attempt to protect the" child, "can contribute to an endangering environment and thus support an endangerment finding." *Id.* Put another way, although a parent may not be directly responsible for the endangering environment, she may still be responsible by "knowingly allow[ing] the child to remain in" that environment. TEX. FAM. CODE § 161.001(b)(1)(D). Whether a parent bears such responsibility "is necessarily dependent on the facts and circumstances." *J.W.*, 645 S.W.3d at 750.

No one, including Mother, disputes that Father's conduct created a dangerous environment for the children. The harder question is the degree of responsibility Mother bears for allowing her children to remain around Father in that dangerous environment.

Domestic violence is all too often a tragic reality for Texas families. The perpetrator of domestic violence not only injures their abused partner but also may endanger and harm children who witness the abuse, experience the aftermath of such abuse, and live in the conditions under which violence erupts. *See* H. LIEN BRAGG, U.S. DEP'T OF HEALTH & HUM. SERVS., CHILD PROTECTION IN FAMILIES EXPERIENCING DOMESTIC VIOLENCE 9–11 (2003). For victims of domestic violence, the process of leaving their partners can be tremendously difficult given the barriers that may trap them in a cycle of abuse.

To that point, Mother—as a victim of domestic violence and a parent—was not required to act perfectly in terrible circumstances. *See J.W.*, 645 S.W.3d at 750 (holding that even if Father did not do "everything he could," his "concerted effort" precluded an endangerment finding). Still, as a parent, Mother had an obligation to her children: she could not knowingly place them or allow them to remain in conditions endangering to their physical or emotional well-being. TEX. FAM. CODE § 161.001(b)(1)(D). It is important to recognize that today's case does not involve a victim of domestic violence who has worked continuously to leave the dangerous situation but faced ongoing obstacles in doing so. That would be a very different case, and I do not opine on such a situation. To the contrary, here, the record shows that Mother (1) affirmatively indicated that she *refused* to protect the children from Father even after *admitting* that he had engaged in endangering conduct and (2) continued to use drugs while the case was pending even though such drug use impeded her ability to protect the

8

children from Father. That evidence, discussed below, provides ample support for the jury's endangerment findings.

Prior to removal, Mother told the Department investigator that she feared for her safety as well as the safety of her children because she was concerned that Father's actions could escalate to violence against the children. Moreover, Mother recognized that the children had already been exposed to Father's repeated violent outbursts.

Because of that endangering environment, the Department informed Mother that allowing Father back into the home would constitute a danger to the children, thereby risking their removal. Mother agreed to a safety plan, which required Father to be supervised—by someone other than Mother—when he was with the children for their safety. Despite the safety plan and her own recognition of the danger to her children, Mother allowed Father to return home. When Father returned, Mother did not leave, as she had before, or report his presence.[2] Instead, Mother refused to provide the Department access to the children without a court order. Accordingly, the Department sent a police officer to conduct a welfare check on the children, leading to the discovery that Father was present in the home again.

That evidence supports a finding that Mother "knowingly placed or knowingly allowed the [children] to remain in [endangering] conditions" and "with persons who engaged in [endangering] conduct." *Id.* § 161.001(b)(1)(D)–(E). Father's conduct clearly endangered the

---

[2] Father had a pending warrant for his arrest at the time.

9

children's well-being, and Mother was aware of the danger he posed. Still, she knowingly violated the safety plan and allowed Father back into the home. Moreover, she became obstinate about her unwillingness to distance the children from Father. Mother did not need to solve everything on her own, but she did have to do the best she could to insulate her children from Father's violent behavior. Her failure to do so satisfies the predicate grounds.

Mother's drug use is further evidence of her inability to protect the children from Father and supports the endangerment finding. *See In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) ("[A] parent's use of narcotics and its effect on [their] ability to parent may qualify as an endangering course of conduct."). This evidence is particularly concerning because of the impact that drugs would necessarily have on Mother's ability to take action to protect the children under such circumstances. Mother knew that she would be impaired by using drugs, but she did so anyway. During the pendency of the case, Mother tested positive for heroin, methamphetamine, amphetamines, and opiates. At trial, Mother admitted to using marijuana with Father. Given the danger Father posed to the children, a reasonable juror could have formed a firm conviction that Mother's drug use impaired her ability to protect the children and thereby endangered them.

### B. Best Interest

The Department must also prove by clear and convincing evidence "that termination is in the best interest of the child." TEX. FAM. CODE § 161.001(b)(2). Sufficient evidence supports this finding as well.

10

The Court takes issue with the jury's finding for three principal reasons: (1) the trial court did not give Mother enough time to complete the service plan; (2) the Department did not give Mother a clear directive regarding her relationship with Father; and (3) the children's conditions were worsening while in foster care. *Ante* at 30. Of these reasons, only the third properly focuses on the children's interests. In my view, the evidence in this case that Mother would allow Father around the children despite the clear danger he posed means that a reasonable juror could have formed a firm conviction that termination was in the children's best interest—to save them from a home in which they were likely to suffer more trauma.

Above all, the best-interest inquiry "is child-centered and focuses on the child's well-being, safety, and development." *A.C.*, 560 S.W.3d at 631. The evidence relevant to the predicate grounds may also be probative of best interest. *Id.* at 631–32. Several nonexclusive factors inform the inquiry:

> (1) the desires of the child; (2) the child's emotional and physical needs now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parenting abilities of the individuals seeking custody; (5) the programs available to assist those individuals to promote the child's best interest; (6) the plans for the child by those individuals or by the agency seeking custody;[3]

---

[3] "[T]he lack of evidence about definitive plans for permanent placement and adoption cannot be the dispositive factor; otherwise, determinations regarding best interest would regularly be subject to reversal on the sole ground that an adoptive family has yet to be located." *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). Rather, "the inquiry is whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that termination of

(7) the stability of the home or proposed placement; (8) the parent's acts or omissions that may indicate the existing parent–child relationship is improper; and (9) any excuse for the parent's acts or omissions.

*J.W.*, 645 S.W.3d at 746 (citing *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976)). "[E]vidence that a parent will knowingly expose [a] child to a dangerous environment in the future" is "relevant to a best-interest determination." *Id.* at 749.

In my view, the third *Holley* factor weighs heavily in favor of termination. As Mother herself recognized, Father's behavior presented a very real risk of physical harm to the children. Importantly, she later retracted these safety concerns and became obstinate about not distancing the children from Father. At trial, Mother claimed that Father did not pose a threat to the children, and she stated that she would not keep Father away from the children if they were returned to her. When asked if she thought the children would suffer more trauma from seeing their parents divorce or witnessing their Father attempt suicide, she stated that both would be "equally traumatizing." Thus, not only was it clear to the jury that Mother was likely to allow Father to be present with the children, but it was also clear that Mother no longer took seriously the threat Father posed to them. Given this evidence, the jury could have concluded that Mother would likely expose the children to the same dangerous environment they experienced before and that it was not in the children's best interest to return to that environment.

---

the parent's rights would be in the child's best interest—even if the agency is unable to identify with precision the child's future home environment." *Id.*

12

Additionally, Mother did not remain drug free during the pendency of the case even though drug use impacts her ability to protect the children. From November 2022 through February 2023, Mother refused five requests to take court-ordered drug tests. When Mother did eventually submit to a drug test, she tested positive for heroin, methamphetamine, amphetamines, opiates, and marijuana. Her continued drug use bears upon her ability to care for the children, including keeping them safe from Father. When combined with Mother's inconsistent positions on whether Father posed a danger to the children, the jury could reasonably form a firm conviction that Mother could not meet their needs now or in the future. *See In re C.A.G.*, No. 14-18-00930-CV, 2019 WL 1523114, at *9 (Tex. App.—Houston [14th Dist.] Apr. 9, 2019, pet. denied).

The second *Holley* factor favors termination as well. The children had significant emotional needs that Mother appeared unlikely, or unwilling, to meet. Henry and Beth received treatment in psychiatric hospitals and exhibited violent behavior toward others. Mary was "extremely traumatized" and suffered from anxiety as well as "severe behavioral meltdowns." Mother indicated that she was reluctant to administer medication prescribed for the children's mental health.

The Court views the children's behavioral issues as evidence that "whatever [the Department] was trying did not seem to be working." *Ante* at 30. But the jury could reasonably have concluded that the children were suffering *because* of the traumatic environment in which they had lived. To start, the jury heard evidence that the children exhibited the same behavioral issues before removal. For example, the

13

family's neighbor testified that, prior to the Department's involvement, Henry punched her son in the face and faced suspension from school for stabbing a student in the eye.

While in foster care, the children were seen by a licensed counselor. The counselor testified that the children expressed awareness of Father's self-harm and the physical altercations between Father and Mother. The jury also heard testimony explaining how children who are exposed to trauma can have difficulty regulating their emotions and behavior. In the counselor's view, the children's behavioral and emotional issues were caused by their exposure to domestic violence and suicide attempts. The counselor further testified that the children were in the process of addressing their trauma. For example, while Mary "carries around an intense amount of anger" that is "eye-opening," the counselor thought that Mary's mental health was likely to improve because she was young and intervention occurred quickly. However, allowing the children to return to the very environment that traumatized them in the first place could, as the counselor testified, exacerbate their current struggles. Under the applicable standard of review, the jury was entitled to credit the counselor's testimony and conclude that the emotional needs of the children weighed in favor of termination.

The Court is also troubled by what it views as inconsistent directives from the Department to Mother. The Department's initial goal was, as it ought to be in most cases, to keep the family together. The Department's goals changed, however, when it determined that termination would be in the children's best interest. Father's counselor

in the Batterers Intervention Prevention Program testified that the children would not be safe in the home with Father and that Mother demonstrated an unwillingness to keep him away from the children. Still, the Department did not demand that Mother divorce Father. Rather, it insisted on the children's safety. Their safety did not depend on a divorce, but it did require that Mother not subject the children to Father's abuse.[4]

Finally, I recognize that the children loved their parents and expressed a desire to return home. Mother testified that the children loved both their parents and that Beth had asked to come home. The family's counselor also testified that the children loved their parents. A child's desire is a proper consideration, but it is not dispositive. *See J.W.*, 645 S.W.3d at 746. After all, children naturally love their parents, even when those parents have mistreated them. The jury was entitled to weigh this evidence and decide the ultimate question—whether termination was in the children's best interests. Because ample evidence supports the jury's finding, the fact that the children indicated a desire to return home does not, by itself, allow us to second-guess that finding on appeal.

In the end, I disagree with the Court's view of the evidence, not the law. Of course, a parent should not lose a child because of a partner's abuse. *Ante* at 23. And of course, a victim of domestic violence should

---

[4] The Court recognizes this point: "A mother . . . cannot invoke the marriage to exempt herself from the duty of protecting the children, of course, and that may sometimes even leave her with little option but to see her husband only when the children are not present." *Ante* at 26.

15

not be blamed or punished for the actions of an abuser. *Id.* at 24. While termination of parental rights is undoubtedly the "'death penalty' of civil cases" and is appropriately treated as such by the law and the courts, *In re K.M.L.*, 443 S.W.3d 101, 121 (Tex. 2014) (Lehrmann, J., concurring), its purpose is not to punish parents but to protect children.

In the Court's view, "The evidence showed that [Mother] understood her obligation to ensure that the children were not subjected to danger from Father going forward, that she was committed to complying with that obligation, and that she was capable of doing so . . . ." *Ante* at 24. But that evidence was far from undisputed, and it remains the jury's "responsibility to weigh evidence, draw inferences, and evaluate witness credibility." *J.W.*, 645 S.W.3d at 745. The jury could have chosen to credit Mother's testimony that she would protect her children. Instead, the jury credited Mother's past conduct and her testimony that she did not intend to keep the children's abusive father away. Properly deferring to the jury's role as factfinder requires us to allow them that choice because it is the jury who is tasked with hearing the evidence and evaluating its credibility. *See J.F.-G.*, 627 S.W.3d at 311–12. A reasonable juror could have formed a firm conviction that it was in the children's best interests to no longer have a legal relationship with Mother.

### III. Conclusion

I would hold that legally sufficient evidence supports the jury's findings, by clear and convincing evidence, that both Mother and Father endangered the children and that termination of Mother's and Father's parental rights was in the children's best interest. In holding otherwise

16

as to Mother, the Court fails to properly defer to the jury's role as factfinder.  Because that failure works against the best interest of the children in this case, I respectfully dissent.

Debra H. Lehrmann<br>
Justice

**OPINION FILED:** June 5, 2026